IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| State of Utah, | ) | OPINION |
| | ) | |
| Plaintiff and Appellee, | ) | Case No. 20080650-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (July 27, 2012) |
| Karl Grant Losee, | ) | |
| | ) | 2012 UT App 213 |
| Defendant and Appellant. | ) | |

-----

Third District, West Jordan Department, 061402369
The Honorable Terry L. Christiansen

Attorneys:    Robert L. Donohoe, Salt Lake City, for Appellant
            Mark L. Shurtleff and Jeanne B. Inouye, Salt Lake City, for Appellee

-----

Before Judges McHugh, Davis, and Christiansen.

McHUGH, Presiding Judge:

¶1    Appellant Karl Grant Losee appeals from his conviction of solicitation to commit aggravated murder.  *See* Utah Code Ann. § 76-4-203 (2008) (criminal solicitation); 76-4-204 (2003) (current version at *id.* (2008)) (criminal solicitation penalties); *id.* § 76-5-202 (Supp. 2006) (current version at *id.* (Supp. 2011)) (aggravated murder).[1]  Losee also

_____

[1]Because of material amendments to the aggravated murder and solicitation statutes, we cite the version of the Utah Code in effect at the time of the offense unless otherwise indicated.  Because the elements of criminal solicitation have not changed we cite the current version of that statute for the convenience of the reader.

appeals his sentence, claiming that he should not have been punished for a first degree felony. We affirm.


BACKGROUND[2]

¶2     In late August 2006, Losee was in the Salt Lake County Jail on charges related to a May 2006 assault (the May Assault) on a female acquaintance (Victim).[3] While incarcerated, Losee befriended another inmate (First Inmate). Over the following weeks, Losee told First Inmate that "he loved [Victim]" but that "one day he went to her house and there was another guy there . . . and it hurt" Losee. Losee stated that "he wanted [Victim] dead" and asked First Inmate to arrange for someone to kill her. Losee told First Inmate that he "would pay a person $500 and two boxes of syringes to get it done." As additional payment, Losee promised to identify the location of a home where guns could be stolen.

¶3     Losee also provided detailed advice on how to kill Victim. He informed First Inmate that Victim "was on Lortabs," due to a back injury and suggested that the murderer make her death look like an overdose. Losee explained that he did not want the murderer to shoot Victim or to "beat her or anything like that" because it would look like murder and the authorities "would know it was [Losee]." He gave First Inmate a map to Victim's house, on which he included a description of Victim and her car. In addition, Losee advised First Inmate that the best opportunity to murder Victim would be while she was getting her mail, which Losee explained she did at the same time each day. Losee stated that Victim is "really friendly" and suggested that the murderer approach her, "walk her to her door," push her inside, and "OD her up with some heroin." Finally, Losee requested that right before Victim died, the murderer tell her, "You shouldn't have fucked over the little man." First Inmate explained that "little

---

[2]On appeal from a jury trial, we view the "facts in a light most favorable to the jury's verdict" and "present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346. Because the conflicting testimony is relevant to our analysis, we include it as indicated.

[3]Losee pleaded guilty on September 7, 2006, to aggravated assault and aggravated burglary in connection with the May Assault.

man" was a moniker used by Losee. Instead of arranging the murder, First Inmate told a correctional officer about Losee's scheme and gave the map to his attorney.

¶4    Losee was charged with solicitation to commit aggravated murder. He filed a motion in limine, seeking to exclude evidence of the May Assault under rules 403 and 404(b) of the Utah Rules of Evidence. At a June 21, 2007 hearing on the motion, Losee argued that the evidence should be excluded because the "purely emotional state" Losee was in during the May Assault did not equate to the level of specific intent required to prove solicitation to commit aggravated murder. Losee also claimed that the May Assault was too remote in time because it occurred several months before the alleged solicitation.[4] He further asserted that the evidence was inadmissible because it would "likely confuse the jury to the point that jurors may disregard the issue of [Losee's] mental state."

¶5    The State opposed Losee's motion, arguing that the evidence was "inextricably intertwined" with the solicitation charge. The State claimed that it helped to prove Losee's personal gain, namely that if Victim were dead, she could not testify against him at a trial on the May Assault.[5] Alternatively, the State claimed that the evidence was not an other act, but was admissible because the two charges were "so directly linked so as to be one continuous interrelated occurrence." Finally, the State argued that even if rule 404(b) applied, the evidence should be admissible because it was highly probative of Losee's "state of mind" and "motive," and because it was "important for the jury . . . to understand how angry this defendant was." According to the State, the evidence was not unfairly prejudicial because "there was nothing in [Victim's] testimony that was [so] substantially dissimilar [to the solicitation charge] that it would

---

[4]While the record does not provide an exact date, it does indicate that the solicitation to commit murder occurred approximately five months after the May Assault.

[5]Although Losee had pleaded guilty to the May Assault at the time the criminal solicitation charges were filed, he had not yet been sentenced. Therefore, the State argued that silencing Victim was a valid motive because Losee could still file a timely motion to withdraw his plea. *See* Utah Code Ann. § 77-13-6(2) (2008) (allowing for the withdrawal of a plea before the sentence is announced "upon leave of the court and a showing that it was not knowingly and voluntarily made").

have caused the jury to hold an increased hostility." The trial court took the matter under advisement and on July 31, 2007, it issued a memorandum decision ruling that Losee's actions during the May Assault could be admitted under rule 404(b).

¶6 At Losee's criminal solicitation trial, Victim testified that the May Assault occurred about two months after she met Losee. Sometime during those two months, Losee purchased a ring for Victim and told her that he wanted her to be his girlfriend. Victim instructed him to return the ring. When Losee again offered Victim the ring about a week later, she stated that she was not interested in a romantic relationship with him.

¶7 On the day of the assault, May 9, 2006, Losee arrived uninvited at Victim's home while she and a friend (Friend) were having dinner. Friend, an artist, and Victim, an author of children's books, had planned to work on illustrations for a book later that evening. Victim invited Losee into her home and offered him dinner, but told him to "watch a movie or do something" while she and Friend worked on the illustrations. After drinking "a couple of wine coolers," Losee's "whole demeanor changed." He became "really upset" and "ornery," and was using "terrible" words. Victim asked him to leave and he did.

¶8 After working on the illustrations for the next few hours, Victim retired to her bedroom and invited Friend to sleep on a pullout sofa in the living room. The "[n]ext thing [Victim] heard was gunshots through [her] front door." She called 911 to report the incident. The emergency dispatcher recorded Victim's call, and the State played about ten minutes of the two hour tape to the jury.[6]

¶9 In the call, Victim can be heard asking, "What are you doing?" and an enraged Losee is heard shouting, "You're a fucking whore." Victim frantically reports to the dispatcher, "He's got a loaded gun right here," as Losee yells, "I'm going to fucking kill you." As the 911 operator attempts to gather information from Victim, Losee can be heard in the background repeatedly stating that Victim is "going to die." Eventually, Victim identifies her assailant as Losee and informs the dispatcher that he shot through the door and is now holding her and Friend at gunpoint. Near the end of the recording

---

[6]The record includes both a tape recording of the entire 911 call and a transcript, which the parties stipulated was the portion of the call played to the jury at trial.

heard by the jury, there is a period of silence during which the 911 dispatcher unsuccessfully attempts to get a response from Victim. The silence is broken by Losee telling Victim to turn on her side and Victim's response, "[P]lease don't. I didn't do anything wrong . . . what did I do?" Losee then states, "I'm going to shoot you in the back." Victim again responds, "I didn't do anything wrong." The State did not play any additional portions of the tape to the jury. However, the State elicited testimony from Victim that Losee fired a shot directly above her head, leaving powder burns on her face.

¶10    Losee did not testify but offered a defense that First Inmate was a jailhouse bully who had framed him. Losee presented his defense through a tape of an interview with a detective (Detective), the testimony of another jail inmate (Second Inmate), and his opening and closing statements. Second Inmate, who described First Inmate as "very large" and "[v]ery intimidating," testified that First Inmate "strong-arm[ed]" other inmates into giving him their commissary purchases. The interview tape contains Losee's statements to Detective that First Inmate's claim that Losee had "offered him money to hurt [Victim]" was "bullshit." It also contains Losee's version of events. Losee claimed that First Inmate had been strong-arming him for his commissary rations until Losee had enough and told First Inmate to "get the fuck out of [his] cell." Losee told Detective that First Inmate became very angry. Losee also speculated that First Inmate was lying to "get a deal to get himself out of [jail]."[7] When confronted with the map to Victim's house, Losee claimed that he had drawn it so that a friend could deliver an apology letter to Victim. Losee also indicated that the he noticed the map was missing from his cell shortly after the confrontation with First Inmate.

¶11    After the jury found Losee guilty, the trial court sentenced him to five years to life in prison, which was to be served consecutively to the sentence he was serving for the May Assault. Losee filed a timely appeal.

### ISSUES AND STANDARDS OF REVIEW

---

[7]First Inmate acknowledged that he had asked his attorney if he could "get a deal" but clarified that his main reason for coming forward was to stop a murder.

¶12  Losee raises two issues on appeal.  First, Losee argues that evidence of the May Assault was wrongfully admitted and unfairly prejudiced the jury against him in the criminal solicitation trial.  We review a trial court's decision to admit evidence of a crime, wrong, or other act under rule 404(b) of the Utah Rules of Evidence for abuse of discretion.  *See State v. Nelson-Waggoner*, 2000 UT 59, ¶ 16, 6 P.3d 1120.

¶13  Alternatively, Losee contends that if his conviction is upheld, he is entitled to a lesser sentence.  Losee claims that he should have been sentenced under the versions of the solicitation and aggravated murder statutes in effect from April 30, 2007, to May 5, 2008, which provided a lesser penalty than the statute in effect at the time of the alleged criminal solicitation and at the time of his sentencing.  *See infra* ¶¶ 31-34.  Losee admits he did not preserve this issue, but asks us to review it for plain error.  *See generally State v. King*, 2006 UT 3, ¶ 20, 131 P.3d 202 (stating that where a defendant fails to preserve an objection, an appellate court "will reverse only if [the defendant] is able to demonstrate either that plain error occurred or that exceptional circumstances exist").


ANALYSIS

I.  The Trial Court Did Not Exceed Its Discretion in Admitting the May Assault Evidence

¶14  Before we begin our analysis of the trial court's decision to admit the May Assault evidence, we place it in the context of the State's burden in this case.  To prove that Losee solicited aggravated murder, the State had to prove that "with intent that [aggravated murder] be committed," Losee either solicited, requested, commanded, offered to hire, or otherwise importuned "another person to engage in specific conduct that under the circumstances as [Losee] believe[d] them to be would be [aggravated murder] or would cause the other person to be a party to the commission of [aggravated murder]."  *See* Utah Code Ann. § 76-4-203 (2008).  Because the crime charged was the solicitation of aggravated murder, the State also had to establish that Losee attempted to "intentionally or knowingly cause[] the death of another" and either that "the [attempted] homicide was committed for pecuniary or other personal gain," or that Loose "engaged or employed another person to commit the homicide pursuant to an agreement or contract for remuneration or the promise of remuneration for

commission of the homicide." *See id.* § 76-5-202 (1)(g), (h) (Supp. 2006) (current version at *id.* (Supp. 2011)).

¶15   Losee argues that the trial court exceeded its discretion by admitting the May Assault evidence because the evidence was "'offered only to show [his] propensity to commit crime.'" (Quoting *State v. Decorso*, 1999 UT 57, ¶ 21, 993 P.2d 837.)  Losee further asserts that the evidence improperly focused on Losee's mental state during the May Assault, rather than during the events related to the charge tried.  Losee also contends that "[t]he earlier events have no bearing on the State's proof of the elements of the solicitation of murder charge."  Finally, Losee argues that the dissimilarity between the two crimes, combined with the "highly emotional" nature of the 911 tape, resulted in the evidence's probative value being substantially outweighed by the risk of unfair prejudice.

¶16   Rule 404(b) provides that while evidence of "a crime, wrong, or other act," cannot be used "to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character," such evidence can be used "for another purpose."  *See* Utah R. Evid. 404(b).[8]  In determining whether a trial court has exceeded its discretion in admitting evidence under rule 404(b), "'[w]e review the record to determine whether the admission of other bad acts evidence was 'scrupulously examined' by the trial judge 'in the proper exercise of that discretion.'"  *See Nelson-Waggoner*, 2000 UT 59, ¶ 16 (quoting *Decorso*, 1999 UT 57, ¶ 18; *see also State v. Marchet*, 2009 UT App 262, ¶ 19, 219 P.3d 75.  To scrupulously examine the evidence, a trial court must first decide whether it is "offered for a proper, noncharacter purpose."  *See Nelson-Waggoner*, 2000 UT 59, ¶ 18.  If the evidence's purpose is "only to show the defendant's propensity to commit crime, then it is inadmissible."  *Id.*  The court must also decide whether the evidence "meets the requirements of rule 402, which permits admission of only relevant evidence."  *See id.* ¶ 19; *see also* Utah R. Evid. 401, 402.  If the evidence is relevant for a proper, noncharacter purpose, it may still be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice."

---

[8]For the convenience of the reader, we cite the current version of rule 404 and other rules of evidence, which were amended "stylistically" in 2011.  *See generally* Utah R. Evid. 404, 2011 advisory committee's note ("There is no intent to change any result in any ruling on evidence admissibility.").

*Nelson-Waggoner*, 2000 UT 59, ¶ 20; *see also* Utah R. Evid. 403. In conducting that analysis, we consider several factors (the *Shickles* factors), which include the following:

> [T]he strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

*State v. Shickles*, 760 P.2d 291, 295-96 (Utah 1998) (internal quotation marks omitted), *quoted in Nelson-Waggoner*, 2000 UT 59, ¶ 20.

A. The Trial Court Scrupulously Examined the May Assault Evidence

     1.     Proper, Noncharacter Purpose

¶17    Losee argues that evidence of the May Assault was "'offered only to show [his] propensity to commit crime.'" (Quoting *Decorso*, 1999 UT 57, ¶ 21.) According to Losee, his emotional state during the May Assault was not probative of his motive to solicit murder several months later. In support, Losee relies on decisions in which the relationship between the crime charged and the other act were held to be too tenuous to be probative of the asserted noncharacter purpose. *See, e.g., State v. Featherson*, 781 P.2d 424, 428-30 (Utah 1989) (holding that a rape conviction and uncharged conduct from at least nine years before the charged rape were too remote in time to be probative of a noncharacter purpose); *State v. Webster*, 2001 UT App 238, ¶¶ 35, 37, 32 P.3d 976 (holding that there was not enough evidence of similarity between a prior Virginia car theft and the charged Utah car theft for the prior bad act to be probative of identity or intent). However, the trial court ruled that the extreme level of anger Losee unleashed on Victim during the May Assault was directly probative of his motive in the later plot to murder her, thereby distinguishing this case from those cited by Losee.

¶18    Proof of motive is "another purpose" identified as proper for admitting 404(b) evidence. *See* Utah R. Evid. 404(b)(2); *see also State v. Bisner*, 2001 UT 99, ¶ 57, 37 P.3d 1073 (holding that evidence of a drug debt was properly admitted to prove the defendant's "motive and intent" to commit murder). In a case similar in some respects

to the present matter, *State v. Holbert*, 2002 UT App 426, 61 P.3d 291, this court held that evidence of a defendant's prior domestic violence was probative of the defendant's "motive to engage in threatening behavior against [the same victim] as a means for coping with the divorce." *See id.* ¶ 34. The *Holbert* court concluded that the defendant's prior conduct was admissible to prove intent to terrorize the victim, which was an element of the crime charged, because it showed that Holbert "could easily use the same threatening behavior to terrorize the victim in the future." *See id.* ¶ 35 (internal quotation marks omitted).

¶19 Moreover, we are convinced that the trial court carefully examined the purpose for which the State offered the May Assault evidence before issuing its written ruling that it could be admitted. The May Assault came after Victim rejected Losee's romantic advances and after he believed that she had established a relationship with another man. The trial court ruled that the evidence was admissible to prove Losee's "emotional motive" to murder Victim, reasoning that "the emotion created at the severing of romantic relations, or from the feeling of betrayal, is a classic motivation . . . to commit murder." The trial court also considered the roughly five months between the May Assault and the murder plot, concluding that the interval was not too long to diminish the relevance of the evidence in the context of this case due to the extreme sense of betrayal evidenced by Losee's prior assault.

¶20 The trial court is in an advantaged position to evaluate the purpose of the 404(b) evidence in the context of the proceedings. *See State v. Northcutt*, 2008 UT App 357, ¶ 17, 195 P.3d 499; *cf. State v. Levin*, 2006 UT 50, ¶ 20, 144 P.3d 1096 ("[A] trial court is in a better position to judg[e] credibility and resolv[e] evidentiary conflicts." (alterations in original) (internal quotation marks omitted)). Here, the trial court expressly considered the issue of whether the State had offered the May Assault evidence for a proper purpose, rather than to prove a propensity for violence. After carefully considering the arguments advanced by Losee, the trial court determined that evidence of the May Assault was relevant to both Losee's motive and intent to solicit Victim's murder. We are convinced that the trial court performed a proper examination of that question.

### 2. Relevance

¶21 We next consider the trial court's consideration of the relevance of the May Assault. Evidence is relevant if it tends "to make a fact [of consequence] more or less probable than it would be without the evidence." Utah R. Evid. 401; *see also State v. Nelson-Waggoner*, 2000 UT 59, ¶ 19, 6 P.3d 1120. Relevant evidence is presumed admissible, unless it is barred by constitution, statute, or court rule. *See* Utah R. Evid. 402. Other bad acts evidence is admissible against a criminal defendant if it "tends to prove some fact that is material to the crime charged—other than the defendant's propensity to commit crime." *Nelson-Waggoner*, 2000 UT 59, ¶ 26 (citing *State v. Decorso*, 1999 UT 57, ¶ 22, 993 P.2d 837).

¶22 Losee argues that the evidence was irrelevant to the present charges because his emotionally charged state during the May Assault has "no bearing" on the deliberate and focused specific intent necessary to solicit another to commit murder. Losee also claims that the May Assault was too remote in time to be relevant.

¶23 In its written decision, the trial court reasoned that the May Assault brought "insight and understanding to not only the emotional ties which [Losee] had to [Victim] at the time, but ha[d] a tendency to make the fact that [Losee] wanted the source of his emotional pain and trauma removed from his life more probable." In addition, the trial court concluded that the fact that Losee had previously acted on his extremely volatile emotions made it more likely that Losee intended that First Inmate actually kill Victim and tended to disprove Losee's claim that First Inmate fabricated the murder-for-hire plot. The trial court also determined that the evidence was relevant to provide the jury context for the solicitation charge. We are convinced that the trial court carefully considered this issue and did not exceed its discretion in finding it relevant.

### 3. Probative Value Weighed Against the Danger of Unfair Prejudice

¶24 Under rule 403 of the Utah Rules of Evidence, a court may exclude relevant evidence if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Utah R. Evid. 403. When undertaking a rule 403 analysis, a trial court "'indulge[s] a presumption in favor of admissibility.'" *State v. Burke*, 2011 UT App 168, ¶ 34, 256 P.3d 1102 (alteration in original) (quoting *State*

*v. Dunn*, 850 P.2d 1201, 1222 (Utah 1993)), *cert. denied*, 263 P.3d 390 (Utah 2011). Losee argues that the evidence of the May Assault was unfairly prejudicial because it likely created an emotional response by the jury, significantly outweighing any probative value.[9] However, all evidence "is prejudicial in the sense of being damaging to the party against whom it is offered." *State v. Killpack*, 2008 UT 49, ¶ 53, 191 P.3d 17 (internal quotation marks omitted). Thus, evidence reaches "the level of unfair prejudice that rule 403 is designed to prevent" only if it "poses a danger of 'rous[ing] the jury to overmastering hostility.'" *Id.* (alteration in original) (quoting *State v. Reed*, 2000 UT 68, ¶ 29, 8 P.3d 1025). Under this standard, even an emotionally charged 911 tape does not automatically run afoul of rule 403. *See State v. C.D.L.*, 2011 UT App 55, ¶ 36, 250 P.3d 69 (holding a 911 tape admissible where the victim's "harried tone" demonstrated her emotional state, lending credibility to the State's case and tending to discredit contrary witness testimony), *cert. denied*, 255 P.3d 684 (Utah 2011).

¶25    The trial court recognized the issues raised by the emotionally charged recording of Victim's 911 call made during the May Assault, and it carefully considered each of the *Shickles* factors in reaching its determination that the evidence's probative value was not substantially outweighed by the danger of unfair prejudice. *See generally Nelson-Waggoner*, 2000 UT 59, ¶ 20. The trial court first reviewed the strength of Victim's testimony and the 911 tape, and concluded that it "conclusively establish[ed]" that the May Assault occurred and that it was "essential" proof of "the emotional element of the motive." The court next found that "the thread of commonality [was] conclusively established by the identity of the victim and her previous relationship with [Losee]." With respect to the approximately five months between the two incidents, the trial court determined that the interval did not detract from the commonality because the "crimes were perpetrated against the same victim, for arguably a common reason and outcome." The trial court also explained that "the animosity and the emotion which fueled the events of May 9-10," including Losee's threats to kill Victim and firing a gun

---

[9]At oral argument, Losee asserted that the trial court should have minimized the prejudicial impact of the evidence. However, because Losee's brief only advocated for the exclusion of the evidence as a whole, we do not consider that argument. *See In re Gregory*, 2011 UT App 170, ¶ 10, 257 P.3d 495 ("We will not reverse based on an unbriefed argument raised for the first time at oral argument."), *cert. denied*, 262 P.3d 1187 (Utah 2011).

near her, "clearly establish this emotional motive in a way no other evidence available to the State can." Finally, the court evaluated whether the evidence would "rouse the jury to overmastering hostility," concluding that while Losee's actions during the May Assault were "undeniably extreme," they were "no less extreme than the actions which led to the charge of Solicitation to Commit Aggravated Murder." Thus, the trial court concluded that the evidence of the May Assault was admissible because its probative value was not substantially outweighed by the danger of unfair prejudice.

¶26    After affording the parties an opportunity to be heard, the trial court took the matter under advisement and then issued a written decision in which it addressed each prong of the 404(b) analysis, including whether the danger of unfair prejudice was substantially greater than the evidence's probative value. The trial court's actions reflect an understanding of the gravity of the evidence and its potential impact on the jury. Weighing these factors in light of the unique circumstances of the case, the trial court concluded that the May Assault evidence could be admitted. We are convinced that the trial court undertook the level of thoughtful consideration required under rule 404(b), and we hold that it did not exceed its discretion by admitting the evidence.

## II.  Losee's Sentence Does Not Raise Ex Post Facto Concerns

¶27    Losee next argues that he is entitled to be sentenced for a second degree felony because the penalty for solicitation to commit aggravated murder was amended from a first degree felony to a second degree felony after he committed the crime but before he was sentenced for it. Losee claims that the trial court's imposition of a sentence applicable to a first degree felony violated the federal and state constitutional bars on ex post facto laws. *See* U.S. Const. art. I, § 10, cl. 1; Utah Const. art. I, § 18.

¶28    This issue was not raised before the trial court, and thus it is unpreserved. *See* Utah R. App. P. 24(a)(5)(A) (requiring "citation to the record showing that the issue was preserved"); *O'Dea v. Olea*, 2009 UT 46, ¶ 18, 217 P.3d 704 (same). "The preservation rule applies to every claim, including constitutional questions, unless a defendant demonstrates that exceptional circumstances exist or that plain error occurred." *Seamons v. Brandley*, 2011 UT App 434, ¶ 3, 268 P.3d 195 (citing *State v. Holgate,* 2000 UT 74, ¶ 11, 10 P.3d 346).

¶29    Losee concedes that he did not preserve this argument but asserts that we can review the issue for the first time on appeal under the doctrine of plain error. To establish plain error, Losee must show that "an error did in fact occur" and that "the error should have been obvious to the trial court." *See State v. King*, 2006 UT 3, ¶ 21, 131 P.3d 202 (internal quotation marks omitted). Additionally, Losee must show "that the error was harmful, i.e., that there is a reasonable likelihood that he would have enjoyed a more favorable outcome absent the error." *See id.* (internal quotation marks omitted). We conclude that Losee cannot satisfy the first requirement that the trial court erred in sentencing him as a first degree felon.

¶30    Both the United States and Utah Constitutions prohibit the legislative branch from passing ex post facto laws. *See State v. Holt*, 2010 UT App 138, ¶ 7, 233 P.3d 828 (citing U.S. Const. art. I, § 10, cl. 1; Utah Const. art. I, § 18), *cert. denied*, 241 P.3d 771 (Utah 2010). "We have interpreted the Utah ex post facto clause . . . consistently with the United States Supreme Court's interpretation of the ex post facto clause found in the United States Constitution." *State v. Daniels*, 2002 UT 2, ¶ 42, 40 P.3d 611 (footnote omitted). Of the four categories of criminal laws that the United States Supreme Court has held to constitute ex post facto laws, only one is relevant here: "Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Carmell v. Texas*, 529 U.S. 513, 522 (2000) (emphasis omitted), *cited with approval in State v. Marshall*, 2003 UT App 381, ¶ 10, 81 P.3d 775.

¶31    When Losee solicited First Inmate in 2006, aggravated murder was classified as a capital felony, regardless of whether the prosecutor actually sought the death penalty. *See* Utah Code Ann. § 76-5-202(2) (Supp. 2006) (current version at *id.* § 76-5-202(3) (Supp. 2011)). At that time, the criminal solicitation of a capital felony was a first degree felony. *See id.* § 76-4-204(1) (2003) (current version at *id.* § 76-4-204(1)(a) (2008)). Thus, when Losee committed the criminal solicitation of a capital crime, his actions were punishable as a first degree felony and he could therefore be sentenced to five years to life in prison. *See id.*; *id.* § 76-3-203.[10]

---

[10]Section 76-3-203, which provides indeterminate sentence terms for felony convictions, was last amended in 2003. *See* Utah Code Ann. § 76-3-203 (2008) (last amended by Sentencing for Use of Dangerous Weapon, ch. 148, § 2, 2003 Utah Laws

(continued...)

¶32     In 2007, the Utah Legislature amended the aggravated murder statute, making aggravated murder a capital felony only if the prosecutor sought the death penalty. *See id.* § 76-5-202(3)(a) (Supp. 2007). Otherwise, it was a noncapital first degree felony, punishable by either "life in prison without parole" or an indeterminate term of 20 years to life in prison. *See id.* § 76-5-202(3)(b); *id.* § 76-3-207.7 (current version at *id.* (Supp. 2011)). At that time, criminal solicitation of a noncapital first degree felony was punishable as a second degree felony. *See id.* § 76-4-204(1) (2003).

¶33     Losee's trial took place from April 1 to 4, 2008. Because Victim had not been murdered, the State had no option to seek the death penalty against Losee.[11] *Cf. id.* § 76-4-102(1) (2003) (current version at *id.* (2008)) (classifying the attempt to commit a "capital felony" as a noncapital "first degree felony"). As a result, at the time of his trial, Losee's crime would have been classified as solicitation of a first degree felony, which was then a second degree felony, punishable by an indeterminate term of one to fifteen years. *See id.* § 76-4-204(2) (2003); *id.* § 76-3-203.

¶34     However, the criminal solicitation statute was amended before Losee's July 15, 2008 sentencing to provide that solicitation of any "felony punishable by imprisonment for life without parole" is a first degree felony. *See* Utah Code Ann. § 76-4-204(1)(a) (2008) (effective May 5, 2008). When Losee was sentenced, aggravated murder continued to be punishable by "life in prison without parole," making solicitation of aggravated murder a first degree felony. *See id.*; *id.* § 76-3-207.7(2); *id.* § 76-5-202(3)(b).

---

[10](...continued)
707, 708).

[11]The State argues that the 2007 solicitation and aggravated murder statutes created only the possibility of a second degree felony because the State retained the option to seek the death penalty, thereby making solicitation of aggravated murder a potential capital felony. However, because Victim was not murdered, the State had no option to file "a notice of intent to seek the death penalty" as required, under the 2007 statute, for aggravated murder to be classified as a "capital felony." *See* Utah Code Ann. § 76-5-202(3)(a), (b) (Supp. 2007) (current version at *id.* (Supp. 2011)). Thus, during the time that the 2007 statute was in effect, Losee's conviction for criminal solicitation of aggravated murder would have been a second degree felony. *See id.*; *id.* § 76-4-204 (2003) (current version at *id.* (2008)).

¶35　Thus, at the time Losee solicited First Inmate to murder Victim in 2006 and at the time he was sentenced on July 15, 2008, solicitation of aggravated murder was a first degree felony punishable by an indeterminate term of five years to life in prison. *See* Utah Code Ann. § 76-3-203 (2008); *id.* § 76-4-204(1) (2003); *id.* § 76-4-204(1)(a) (2008). Nevertheless, Losee argues that it should have been plain to the trial court that he was entitled to be sentenced to a second degree felony under the 2007 statutes and, therefore, was subject to an indeterminate sentence of one to fifteen years.

¶36　Losee argues that "[a]n ex post facto law is one that . . . makes more burdensome the punishment for a crime, after its commission." *See State v. Norton*, 675 P.2d 577, 585 (Utah 1983) (internal quotation marks omitted), *overruled on other grounds by State v. Hansen*, 734 P.2d 421 (Utah 1986). In support, Losee relies upon *State v. Yates*, 918 P.2d 136 (Utah Ct. App. 1996), in which a defendant pleaded guilty to theft of $100 to $250, which at the time of the plea constituted a class A misdemeanor. *See id.* at 137. Before sentencing, the Utah Legislature amended the statute to make theft of less than $300 a class B misdemeanor. *See id.* We held that Yates was entitled to the benefit of that amendment under the longstanding Utah precedent that "[d]efendants are entitled to lesser criminal punishments mandated by statutes that become effective before the court imposes sentence." *See id.* at 139.

¶37　Losee's case is distinguishable from *Yates* because after trial, but before sentencing, the Utah Legislature made further amendments affecting the degree of Losee's felony. As a result, the penalty for solicitation of aggravated murder was a first degree felony, punishable by five years to life in prison, both when Losee committed the crime and when he was sentenced for it. Accordingly, the punishment available was the same at sentencing as it was when Losee engaged in the criminal conduct.

¶38　Losee has not pointed us to any authority that supports the proposition that a defendant is entitled to a lesser penalty that is enacted after a defendant commits the crime but is withdrawn before the defendant is sentenced. Nor is such a rule mandated by the federal or state constitutions. In *Smith v. Cook*, 803 P.2d 788 (Utah 1990), our supreme court ruled that when an "amendment that lessens the criminal penalty becomes effective prior to the time a criminal defendant is sentenced . . . , 'the law in force at the time of *sentencing* govern[s]'" in most instances. *Id.* at 792 (alteration in original) (quoting *Harris v. Smith*, 541 P.2d 343, 344 (Utah 1975)), *superseded by statute on other grounds as stated in State v. Reedy*, 937 P.2d 152, 153 (Utah Ct. App. 1997). An

exception to that general rule is that the punishment available at the time of sentencing cannot be greater than that available when the defendant committed the crime. *See Belt v. Turner*, 25 Utah 2d 380, 483 P.2d 425, 425-26 (1971) (holding that the penalty in effect at the time of sentencing "controls the punishment to be meted out, provided it does not raise a constitutional question of being an ex post facto law by reason of increasing the punishment"). In *State v. Dominguez*, 1999 UT App 343, 992 P.2d 995, this court further clarified that the relevant comparison is between the date the defendant committed the crime and the date the court imposes sentence:

> When the Legislature alters the penalty for a crime after a defendant has allegedly committed the crime but before sentencing, the new statute—the one in effect at the time of sentencing—is applied so long as "it does not raise a Constitutional question of being an ex post facto law by reason of increasing the punishment." *Belt v. Turner*, 25 Utah 2d 380, 483 P.2d 425, 425-26 (1971). However, if, as defendant claims here, the amendment increases the punishment, the sentence should be determined according to the law in effect on the date the crime was committed. *See Smith v. Cook*, 803 P.2d 788, 792 n.20 (Utah 1990).

*Id.* ¶ 11 (footnote omitted).

¶39    Furthermore, the United States Supreme Court has indicated that to be an ex post facto law, the amendment must "inflict[] a greater punishment[] than the law annexed to the crime, when committed." *See Carmell v. Texas*, 529 U.S. 513, 522 (2000). This focus is consistent with the Supreme Court's definition of the interests protected by the constitutional prohibition of ex post facto laws. "Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Weaver v. Graham*, 450 U.S. 24, 30 (1981), *abrogated on other grounds by California Dep't of Corr. v. Morales*, 514 U.S. 499, 506 n.3 (1995); *accord State v. Marshall*, 2003 UT App 381, ¶ 17 n.7, 81 P.3d 775 (acknowledging that the ex post facto prohibition applies to the deprivation of "fair notice" that occurs when the legislature enhances a penalty after a crime is committed). Thus, the prohibition of ex post facto legislation is designed to ensure that a defendant

is on fair notice of the punishment that could be imposed when making the decision to commit the crime.

¶40 Here, the statutes in place at the time Losee solicited Victim's murder put Losee on fair notice that criminal solicitation of aggravated murder could be charged as a first degree felony, punishable by an indeterminate term of five years to life in prison. *See* Utah Code Ann. § 76-5-202(2) (Supp. 2006) (current version at *id.* (Supp. 2011); *id.* § 76-4-204 (2003) (current version at *id.* (2008)); *id.* § 76-3-203 (2008). That is precisely the sentence the trial court imposed. Accordingly, Losee received a sentence that was no more severe than the Utah Legislature permitted at the time he committed the crime. Under these circumstances, the sentence does not implicate the ex post facto prohibition in either the federal or state constitution. Because we conclude that the trial court did not err in imposing sentence for a first degree felony, we need not consider the additional elements of plain error.

CONCLUSION

¶41 The trial court did not exceed its discretion in admitting the May Assault Evidence. Because Losee's sentence was no greater than he could have received at the time he committed the crime of criminal solicitation of aggravated murder, his sentence does not violate the constitutional prohibition of ex post facto laws.

¶42 Affirmed.

_____
Carolyn B. McHugh,
Presiding Judge

-----

¶43 WE CONCUR:

_____
James Z. Davis, Judge

_____
Michele M. Christiansen, Judge