2014 UT App 45

**STATE of Utah, Plaintiff and Appellee,**

v.

**Dennis LINGMANN, Defendant and Appellant.**

No. 20111024–CA.

Court of Appeals of Utah.

Feb. 21, 2014.

Rehearing Denied March 27, 2014.

---

Joanna E. Landau, Attorney for Appellant.

Sean D. Reyes and Jeffrey S. Gray, Salt Lake City, Attorneys for Appellee.

Judge STEPHEN L. ROTH authored this Opinion, in which Judge JAMES Z. DAVIS and Senior Judge RUSSELL W. BENCH concurred.[1]

ROTH, Judge:

¶ 1 Defendant Dennis Lingmann was arrested in 2008 for multiple sex offenses involving a minor. While awaiting trial in the Salt Lake County Jail, he offered his cellmate (Cellmate) $2,000 to kill the minor and

1. The Honorable Russell W. Bench, Senior Judge, sat by special assignment as authorized by law. *See generally* Utah Code Jud. Admin. R. 11–201(6).

her family. Cellmate contacted investigators, who requested that he surreptitiously record further conversations with Lingmann. Cellmate agreed and recorded two conversations in which Lingmann renewed the offer. Lingmann was charged and convicted of six counts of solicitation to commit aggravated murder, and the trial court imposed six consecutive sentences of five years to life in prison. Lingmann appeals, arguing that he received ineffective assistance of counsel, that three of his convictions were unsupported by the evidence, and that imposing six consecutive sentences was an abuse of discretion. We affirm.

## BACKGROUND

¶ 2 Lingmann performed odd jobs and worked as a subcontractor for a family-owned business between 2005 and 2008.[2] Mother, who co-owned the company with Father, described their office as "more of a home family atmosphere than it is a working office building" and often invited their daughters to the office for weekly staff lunches. As a result, the daughters were "familiar with all of the people there who came and went," including Lingmann, who quickly became a "trusted family friend."

¶ 3 In early 2006, however, Lingmann began an inappropriate relationship with one of the family's daughters (Daughter), who was a minor at the time. The relationship continued for three years until Daughter disclosed disturbing details of Lingmann's conduct to her parents and cooperated in the State's subsequent investigation. During the relationship, Lingmann sent Daughter "pretty vile" messages via phone and email, including pornographic images, many of which involved children. He also engaged in unlawful sexual activity with Daughter multiple times. After Daughter ended the relationship, Lingmann continued to send her threatening and inappropriate messages, and her parents eventually obtained a no-contact order.

¶ 4 In March 2009, the State charged Lingmann with ten counts of sexual exploitation of a minor, two counts of stalking, and four counts of unlawful sexual activity with a minor. He was then incarcerated in the Salt Lake County Jail for several months awaiting trial. Lingmann eventually pleaded guilty to four felony sex offenses and stalking.

¶ 5 In jail, one of Lingmann's first cellmates was a man who had been arrested on drug charges in March 2009. Cellmate and Lingmann worked in the kitchen together and developed a rapport. Lingmann opened up about his relationship with Daughter and the pending sex-offense charges against him. According to Cellmate, Lingmann also offered him "some quick money" to kill Daughter's parents because

> [Daughter's parents] push[ed] the issue, like they told their daughter, you got to go and press charges on [Lingmann] for what [he's] doing to you.... And [Lingmann] told me the reason he was in jail right now is because [Daughter's] parents don't like him, so they force her to press sex charges that he was in jail for. That's why he wanted to get that done, that killing done so they won't go testify against him, so he will go free.

¶ 6 Cellmate said that Lingmann initially offered him $8,000 and his truck. He was supposed to pick up a gun from Lingmann's brother, and Lingmann promised to pay him with the proceeds of a Utah Labor Commission complaint he had filed against the family's company.

¶ 7 In late April, Cellmate was moved to a different cell after an injury made it difficult for him to continue working in the kitchen. About two weeks later, Cellmate sent a letter to the district attorney's office, claiming that Lingmann had "told [him] how, when[,] where, he used to have sex with [Daughter], since she was 15" and that Lingmann said "he would pay [Cellmate] 8,000 dollars to kill [Daughter's] parents." In response to the letter, investigators met with Cellmate several times to gather more information. In one

---

2. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly." *State v.* *Kruger,* 2000 UT 60, ¶ 2, 6 P.3d 1116. "We present conflicting evidence only when necessary to understand the issues raised on appeal." *Id.*

of these interviews, Cellmate agreed to surreptitiously record conversations with Lingmann.

¶ 8 Jason Jones, Sergeant of the Unified Police Department's violent crimes unit, made arrangements for Cellmate and Lingmann to be returned to the same cell. Sometime in late May or early June, Cellmate said Lingmann approached him again, but this time he "wanted the whole family" killed, not just the parents, and asked him to burn the family's house down with gasoline. Initially, Lingmann said he wanted to spare Daughter and wrote a letter to Cellmate's wife instructing her to find out if Daughter still had feelings for him. According to Cellmate, when Lingmann received no response, he told Cellmate to "kill everybody."

¶ 9 On June 16, Sergeant Jones met with Cellmate again and gave him a small recording device. Over the next two weeks, Cellmate recorded two conversations with Lingmann. In the first conversation, Lingmann mentioned that he had recently accepted a plea agreement in the sex-offense case. He was upset that Daughter told the police "everything" about their relationship, but Lingmann still thought Daughter's "parents have a big thing to do about it as far as her testifying." Cellmate told Lingmann he was going to burn the house down as they had planned and asked Lingmann if Daughter still lived in her parents' home. Lingmann responded, "as far as anything her life is in God's hands," adding that because Daughter "did nothing to try to keep me out of here," "she's just as big a part as her mom and dad is." Cellmate also asked Lingmann what would happen to Lingmann's labor-commission complaint if the family were killed. "Well, if they're dead," Lingmann responded, "I don't give a shit." Lingmann gave Cellmate the family's address and described the vehicles that would be in the driveway when the family was home. Lingmann also told him when all the family members were most likely to be in the house during the day and

warned him about obstacles he should be wary of to avoid being caught. Lingmann reassured Cellmate that the family had "so many other people that are pissed off at [them] . . ., they would have a list of people that they would have to check with because so many people . . . want to see them dead."

¶ 10 In the second recorded conversation, Lingmann detailed the layout of the family's home, including where each member of the family slept. When Cellmate asked if it was okay to kill one of the sisters, Lingmann said she "can definitely burn, because she's a dumb ass bitch." He told Cellmate that the other two sisters could "burn too." When Cellmate pressed Lingmann on whether he was sure he wanted the whole family dead, Lingmann hesitated at first about Daughter: "If, if [Daughter] writes me back, I don't know, it's hard to say." But when Cellmate expressed concern that Lingmann would report him to police if Daughter happened to be killed with the others, Lingmann assured Cellmate that he had made up his mind that Daughter should be killed "no matter what [she] says because [she] had her chance." Lingmann then gave him detailed directions to the family's home and admonished Cellmate to make sure he got everyone because if he did not, it "would be a winning situation for them because they have insurance on the house." This time, Lingmann offered to pay Cellmate $2,000 and assured him that he would get enough from his labor-commission complaint to cover the obligation.[3]

¶ 11 A few days later, Lingmann was transferred to a different cell. As he was leaving, Lingmann said, "Well [Cellmate], keep your word, that's all we got. . . ." Cellmate understood Lingmann's statement as a final confirmation to "carry through with the plan, with the killings."

¶ 12 Sergeant Jones and Patricia Ishmael, a special agent from Utah's Internet Crimes Against Children Task Force, confronted Lingmann about his conversations with Cell-

---

**3.** One of Lingmann's relatives sold Lingmann's truck while he was in jail. The record is not entirely clear on this point, but that may be why Lingmann reduced his offer from $8,000 to $2,000. Lingmann's statement about the source of the money—the labor-commission com-

plaint—also seems inconsistent with his statements in the first recorded conversation suggesting that the death of the family would prevent any recovery, but the internal logic of his recorded statements is not at issue here.

mate in an interview on August 18, 2009. Lingmann initially denied asking another inmate to harm Daughter's family. Because Mother and Father "still owe[d him] some money from work," Lingmann explained, he had nothing to gain from hurting their family. But when pressed, Lingmann admitted that he had a cellmate who "said that he would burn their house" and that Lingmann "was at that point still angry with them all." He insisted, however, that he did not want them hurt. When Sergeant Jones asked Lingmann why he gave Cellmate the family's address if he did not want them harmed, Lingmann responded, "Well because in the beginning I did want it to happen." Lingmann insisted that even though he gave Cellmate the family's address, described the vehicles that would be in the driveway, and offered to pay him to kill them, he later told Cellmate not to harm the family.

¶ 13 On September 3, 2009, the State charged Lingmann with six counts of criminal solicitation to commit aggravated murder. At trial, prosecutors presented testimony from Cellmate, Sergeant Jones, Special Agent Ishmael, and Mother. They also played the recorded jailhouse conversations and a video of Lingmann's interview with investigators. Lingmann testified that it was Cellmate's idea to kill Daughter's family. Cellmate had lied to Lingmann about his background, claiming that he was a gang member, that he had fired a gun into crowds defending his turf, and that he had been shot multiple times. Lingmann claimed that he gave Cellmate the family's address and other personal information because he was "[t]rying to be tough" to impress Cellmate and better make his way in the jail system, not because he wanted the family harmed.

¶ 14 And according to Lingmann, he instructed Cellmate not to go through with the plan just days after he asked him to burn down the family's home and one day before pleading guilty in the sex-offense case. He testified that he told Cellmate that the scheme was "crazy," that he had unpaid bills and needed the family alive to recover money from his labor-commission complaint, and that his truck had been sold already. And Lingmann maintained that Cellmate clearly understood that he did not want the family harmed:

> [Cellmate] was acting like he was asleep. I hit him on the leg. He said, What?
>
> I said, Did you hear me?
>
> He's like, Yeah, I heard ya.
>
> I said, I don't want you to do anything.
>
> He says, Okay.
>
> I says, Are we square on that?
>
> And he said, Yes.

¶ 15 Lingmann's version of their parting conversation also differed from Cellmate's. Lingmann testified that he told Cellmate to "keep [his] word" that he and Cellmate were "not doing anything" and that Lingmann did not "want anything to happen." According to Lingmann, Cellmate agreed, and as Lingmann left the cell, he urged him to keep his promise because "[o]ur word's all we got."

¶ 16 In his closing argument, Lingmann's trial counsel conceded that there was "certainly enough evidence to convict [Lingmann] of solicitation to commit aggravated murder, six counts, if you do not believe him when he told you that he came to his senses when he [pleaded] guilty to his crimes, accepted responsibility for his actions, began thinking clearly and told [Cellmate] to forget it, that he didn't want anybody harmed." The jury convicted Lingmann of all six counts, finding that Lingmann solicited the murder of six people in retaliation for the family's role in his initial prosecution. The district court imposed six consecutive sentences of five years to life in prison. Lingmann filed a motion to arrest judgment, arguing that he had introduced uncontroverted evidence that he voluntarily withdrew his request for Cellmate to kill Daughter and her family. The court denied the motion, and Lingmann now appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 17 Lingmann raises three issues on appeal. First, he argues that his trial counsel provided ineffective assistance by conceding the elements of criminal solicitation and focusing exclusively on the defense that Lingmann voluntarily withdrew his offer to Cellmate. These concessions, Lingmann maintains, foreclosed "the legitimate de-

fense" that Lingmann lacked the intent necessary to sustain a criminal solicitation conviction. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162.

¶ 18 Second, Lingmann challenges the sufficiency of the evidence to support three of his convictions. In particular, he asserts that there was no evidence "that Lingmann solicited [Cellmate] to retaliate against [the three sisters] for participating in legal proceedings." Therefore, Lingmann argues, the State did not prove the aggravating circumstances of those convictions, and they "should be vacated." In evaluating sufficiency claims, we view "the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict." *State v. Shumway*, 2002 UT 124, ¶ 15, 63 P.3d 94. Accordingly, the standard of review for sufficiency claims is highly deferential—"[w]e will reverse a jury verdict for insufficient evidence only if we determine that reasonable minds could not have reached the verdict." *State v. Workman*, 2005 UT 66, ¶ 29, 122 P.3d 639 (citation and internal quotation marks omitted).

¶ 19 Third, Lingmann argues that "[b]ecause [he] was convicted for a single inchoate crime, the court should have imposed concurrent sentences," not six consecutive sentences "as though he committed six substantive crimes." District courts have "wide latitude and discretion" when making sentencing decisions, and we will not reverse a sentencing determination absent an abuse of discretion. *State v. Moa*, 2012 UT 28, ¶ 34, 282 P.3d 985 (citation and internal quotation marks omitted). Whether Utah law prohibits the imposition of consecutive sentences for inchoate crimes is a question of law reviewed for correctness. *See State v. Thorkelson*, 2004 UT App 9, ¶ 9, 84 P.3d 854 (reviewing the legality of a defendant's sentence for correctness).

## ANALYSIS

¶ 20 We conclude that Lingmann's counsel did not provide ineffective assistance and that the evidence presented at trial is sufficient to support all six convictions. We also conclude that the trial court did not abuse its discretion when it imposed consecutive sentences.

### I. Ineffective Assistance of Counsel

¶ 21 The Sixth Amendment to the United States Constitution provides criminal defendants with the right to effective assistance of counsel. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."); *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail on an ineffective assistance of counsel claim, Lingmann must show that his trial counsel's performance was deficient and that the deficient performance prejudiced his defense. *See State v. Lenkart*, 2011 UT 27, ¶ 25, 262 P.3d 1 (citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052). An attorney's performance is not deficient unless it falls "below an objective standard of reasonable professional judgment." *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (citing *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052). Trial counsel has "wide latitude in making tactical decisions," and we "will not question such decisions unless there is no reasonable basis supporting them." *State v. Crosby*, 927 P.2d 638, 644 (Utah 1996). "Decisions as to what witnesses to call, what objections to make, and by and large, what defenses to interpose, are generally left to the professional judgment of counsel." *State v. Franco*, 2012 UT App 200, ¶ 7, 283 P.3d 1004 (citation and internal quotation marks omitted).

¶ 22 Lingmann argues that despite "the strong legal and evidentiary support" for a defense that he never intended to harm Daughter and her family, his trial counsel conceded all the elements of criminal solicitation and "pursue[d] a weaker defense of voluntary termination." To convict a defendant of criminal solicitation, the State must prove that the defendant asked "another person to engage in specific conduct that under the circumstances as the actor believes them to be would be a felony." Utah Code Ann.

§ 76–4–203(1) (LexisNexis Supp.2013).[4] A defendant can only be convicted of criminal solicitation if "the solicitation is made under circumstances strongly corroborative of the actor's intent that the offense be committed." *Id.* § 76–4–203(2). Lingmann argues that his trial counsel's exclusive reliance on a voluntary-termination defense amounted to ineffective assistance for three reasons. First, he asserts that voluntary termination is not a defense to criminal solicitation under Utah law. Second, even if it were, Lingmann argues that negating his intent was a stronger defense. And third, he maintains that the evidence at trial did not support a voluntary-termination defense. We conclude that trial counsel's strategic decision to pursue a voluntary-termination defense was not deficient performance.

¶ 23 First, under Utah law, the question of whether voluntary termination is a defense to criminal solicitation remains an open question, and therefore trial counsel's decision to pursue such a defense, though not without risk, did not amount to deficient performance. *Cf. State v. Smit,* 2004 UT App 222, ¶ 30, 95 P.3d 1203 (holding that the trial court's failure to inform the defendant of the possibility of jail time as a condition of probation was not plain error because "the law [was] unclear" on that issue). Lingmann argues that his trial attorney's "concession of the elements [of criminal solicitation] meant voluntary termination could not acquit Lingmann because voluntary termination must occur" before the unlawful solicitation itself occurs. The pertinent statutes, however, do not unambiguously exclude voluntary termination as a defense to criminal solicitation. The criminal solicitation statute prevents a defendant from asserting eight specific defenses to a solicitation prosecution, including a number of defenses typically asserted against criminal conspiracy charges, but voluntary termination is not one of them. Utah Code Ann. § 76–4–203(3), (4) (providing that lack of agreement, no overt act, not taking a substantial step toward commission of the offense, and other defenses cannot be asserted against criminal solicitation charges).

¶ 24 Moreover, other statutes provide some indication that voluntary termination can be asserted as a defense to criminal solicitation. *See State v. Canton,* 2013 UT 44, ¶ 21, 308 P.3d 517 (considering "the language and structure of [a] statutory scheme" to interpret a statute (citation and internal quotation marks omitted)). For instance, Chapter 2 of the Utah Criminal Code sets forth general principles of criminal liability, including culpable mental states and vicarious liability. *See* Utah Code Ann. §§ 76–2–102, –202 (LexisNexis 2012). Section 76–2–202 imposes criminal liability on anyone who "*solicits, requests,* commands, encourages, or intentionally aids another person" to engage in criminal conduct. *Id.* § 76–2–202 (emphasis added). And section 76–2–307 provides that "[i]t is an affirmative defense to a prosecution ... [for] an offense under section 76–2–202 that prior to the commission of the offense, the actor voluntarily terminated his effort to promote or facilitate its commission." *Id.* § 76–2–307.

¶ 25 While it may be true, as Lingmann asserts, that the criminal offense of solicitation is complete the moment a defendant extends an offer, the term "offense" in section 76–2–307 could be read to refer to the underlying criminal act solicited rather than the unlawful solicitation itself. This would allow someone who solicits a criminal act to avoid liability by taking steps to disavow his unlawful request and prevent the underlying crime from occurring—a result Utah law encourages in the context of criminal conspiracies. *See State v. Peterson,* 881 P.2d 965, 970 (Utah Ct.App.1994) ("[A] conspirator who desires to avoid further liability by withdrawing from the conspiracy must take some affirmative action to withdraw from, or thwart, the conspiracy."); *see also State v. Kerekes,* 622 P.2d 1161, 1166 (Utah 1980) ("[E]ven if one has lent aid and encouragement, voluntary abandonment of his participation prior to the commission of the crime relieves him of criminal liability for its commission providing the abandonment was communicated to the remaining parties and occurred prior to a time

**4.** Throughout this opinion, we cite the current version of the Utah Code because no substantive changes have been made to the relevant statutory provisions that would affect the resolution of the issues presented on appeal.

when the crime had become so inevitable that its commission could not reasonably be stayed."); *see also* R. Michael Cassidy & Gregory I. Massing, *The Model Penal Code's Wrong Turn: Renunciation as a Defense to Criminal Conspiracy*, 64 Fla. L.Rev. 353, 363–64 (2012) (noting that one "justification for [a] renunciation defense" to criminal conspiracy "is to offer an incentive for conspirators to desist from criminal activity"). Without clearer law to the contrary, it is difficult to see how trial counsel's decision was objectively unreasonable. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052 (explaining that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

¶ 26 Second, evidence of Lingmann's guilt was strong enough that conceding the elements of solicitation and pursuing a voluntary-termination defense was a reasonable trial strategy. *See State v. Tennyson,* 850 P.2d 461, 465 (Utah Ct.App.1993) (noting that ineffective assistance claims require the defendant to "overcome the strong presumption[ ] ... that under the circumstances, the challenged action might be considered sound trial strategy" (citations and internal quotation marks omitted)). At trial, the jury listened to two recordings where Lingmann offered Cellmate $2,000 to kill Daughter's entire family. He wrote down the address of the family's home and gave Cellmate detailed directions on how to get there, described the vehicles that would be in the driveway, and encouraged Cellmate to kill everyone because "if they don't die," that "would be a winning situation for them because they have insurance on the house." The jury also watched a video of investigators confronting Lingmann about these statements. When Sergeant Jones asked Lingmann why he gave Cellmate the family's address if he was never serious about harming them, Lingmann responded, "Well because in the beginning I did want it to happen." And Lingmann himself testified at trial that killing Daughter and her family was Cellmate's idea "[a]t very first" and that he specifically told him days after the initial offer that he did not "want [Cellmate] to do anything," implicitly acknowledging that at some point in time, Lingmann did in fact intend to harm the family.

¶ 27 Faced with this challenging set of facts, Lingmann's trial counsel elected to pursue a voluntary-termination defense that required him to bolster his client's credibility by conceding the elements of the offense and to attack Cellmate's credibility. In light of the evidence presented at trial, we cannot say there was "no reasonable basis" for that decision. *See State v. Crosby,* 927 P.2d 638, 644 (Utah 1996). The recordings and Lingmann's testimony were largely inconsistent with the notion that he never wanted Cellmate to go through with the killings, but they did not conflict with Lingmann's claim that he specifically told Cellmate to abort the plan. For instance, in Lingmann's August 2009 interview with investigators, Lingmann said that "[a]pproximately two days" after he and Cellmate discussed burning the family's home, Lingmann "cried and told him, I don't want you to do that.... I don't want anything to happen to them. I couldn't have them on my conscience." At trial, Lingmann testified that he made sure Cellmate knew the plan was off within days of the second recorded conversation. The only evidence that contradicted these assertions directly was Cellmate's trial testimony that Lingmann never changed his mind and actually encouraged him to "carry through with the plan." Lingmann's trial counsel accordingly conceded that there was "enough evidence to convict [Lingmann] of solicitation ... if you do not believe him ... that he ... told [Cellmate] to forget it, that he didn't want anybody harmed" and then went on to attack Cellmate's credibility and bolster Lingmann's by contrasting their respective criminal histories:

> Do you believe that [Lingmann] walked away from this crime? That he abandoned his intent? This is a man with no prior criminal history. A productive citizen up until this happened. Or do you choose to believe [Cellmate]? Three-time convicted drug dealer and ... auto thief. Lied to a cop. Lied to Mr. Lingmann about who he was, what he was. After he was released from custody, he did not honor his obligation to appear in court. Had to have a

warrant issued for him. The people that are using him now had to jail him.

He's in maximum security in prison. Had to be taken into custody to ensure his appearance. Committed a probation violation. And was lying to you when he told you that upon their last meeting Mr. Lingmann told him to keep his word and commit the crime, do the foul deed.

¶ 28 We acknowledge that this strategy was not without its risks. Indeed, conceding a "client's guilt to the jury" is at times "a paradigmatic example of the sort of breakdown in the adversarial process" that the Sixth Amendment guards against. *United States v. Gonzalez,* 596 F.3d 1228, 1239 (10th Cir.2010) (citation and internal quotation marks omitted). But in an appropriate case, strategic concessions of guilt can strengthen a defendant's position and represent not just reasonable professional assistance, but astute advocacy. *Compare Turrentine v. Mullin,* 390 F.3d 1181, 1208 (10th Cir.2004) (concluding that an attorney's concession of his client's guilt during closing argument was not deficient performance where the concession had the potential to bolster his credibility with the jury to pursue other defenses), *with Scarpa v. Dubois,* 38 F.3d 1, 10–11 (1st Cir. 1994) (holding that an attorney's concession that his client was a " 'conduit' " for other drug traffickers was deficient performance because it foreclosed any possible meritorious defenses and had no possible strategic basis). Here, given the strong evidence of Lingmann's guilt, attempting to negate his intent would have been a difficult and potentially counterproductive endeavor. *See United States v. Cronic,* 466 U.S. 648, 656 n. 19, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) ("If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade."). By contrast, conceding the elements of the solicitation itself could have bolstered Lingmann's credibility and persuaded the jury that Lingmann's parting words to Cellmate confirmed a prior withdrawal from—not an affirmation of—their unlawful agreement.

¶ 29 Accordingly, we cannot say that trial counsel's strategy was outside "the wide range of reasonable professional assistance" that the Sixth Amendment requires. *See Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because Lingmann has not shown that his trial counsel's performance was deficient, we do not address whether conceding the elements of criminal solicitation prejudiced Lingmann's defense. *See id.* at 697, 104 S.Ct. 2052 ("[T]here is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one.").

## II. Sufficiency of the Evidence to Support Three of the Six Convictions

¶ 30 Lingmann also argues that there was insufficient evidence to support three of his convictions. A conviction for criminal solicitation to commit aggravated murder requires evidence that the defendant specifically intended that the murder be carried out as well as the presence of at least one aggravating factor. *See* Utah Code Ann. § 76–4–203(1), (2) (LexisNexis Supp.2013) (listing the elements of criminal solicitation); *id.* § 76–5–202(1) (outlining twenty possible aggravating factors for murder). Here, the jury convicted Lingmann of soliciting the murder of six people with the aggravating circumstance of "retaliating against a person for testifying, providing evidence, or participating in any legal proceedings or official investigation." *See id.* § 76–5–202(*l* )(k)(iii). Lingmann contends that the trial court should have dismissed three of his convictions because the "evidence did not prove Lingmann intended to retaliate against" Daughter's three sisters "for participating in any legal proceedings." Rather, he maintains that "the evidence failed to show the sisters participated in any legal proceedings or that Lingmann had any specific motivation for including the sisters." "We will reverse a jury verdict for insufficient evidence only if we determine that reasonable minds could not have reached the verdict." *State v. Workman,* 2005 UT 66, ¶ 29, 122 P.3d 639 (citation and internal quotation marks omitted). After reviewing the record, we cannot agree that there was insufficient "proof of his

intent to retaliate" against the sisters for the family's involvement in legal proceedings.

¶ 31 There was evidence presented at trial that Lingmann's attempt to harm the sisters was retaliation for other family members' participation in his prosecution. Cellmate testified that Lingmann offered him "some quick money" to kill Daughter's parents so "they [wouldn't] go testify against him, so he will go free." Then, in the jailhouse recordings prosecutors played for the jury, Lingmann expanded the scope of his plan when he realized Daughter had told the police "everything" about their relationship. He instructed Cellmate to make sure he killed everyone, identifying each sister by name and telling Cellmate to kill them. He even explained to Cellmate how to tell if the sisters were home and discouraged him from burning the family's home on a Saturday evening "because the daughters might be coming home late at 3:00 in the morning" and then Cellmate would not get everyone. The jury also listened to Lingmann's interview with police, where he admitted he was "still angry" with "the whole family" when he asked Cellmate to burn their home.

¶ 32 Lingmann attempts to compartmentalize his animus toward each victim, arguing that he only added the three sisters to the plan "because they lived at home" and "in chagrin at the thought of [Daughter] not responding to his letter." But the spark that set Lingmann's plan in motion was his desire to prevent specific family members from testifying against him, and the fuel that kept it going was his desire to retaliate for their role in the legal process that eventually convicted him. That Lingmann later expanded the scope of his vengeance to include Daughter's entire family does not vitiate the retaliatory

motive that animated the scheme from its inception. In these circumstances, soliciting the murder of a witness is no different from soliciting the murder of a witness's family member in retaliation for that witness's testimony; both seek retribution "against a person for ... participating in [a] legal proceeding[ ] or official investigation." *See* Utah Code Ann. § 76–5–202(1)(k)(iii). We therefore conclude that there was sufficient evidence to support Lingmann's convictions for soliciting the aggravated murder of Daughter's three sisters.

### III. The Consecutive Sentences

¶ 33 Finally, Lingmann challenges the validity of his sentence. First, he argues that the imposition of consecutive sentences for each solicitation conviction was "excessive and unjustly punitive" because Lingmann had committed just one inchoate crime. Second, he asserts that the sentencing judge based her sentencing decision "on unreliable and irrelevant information," including admissions Lingmann made to investigators about his past sexual conduct, his 2009 sex-offense convictions, and the effect Lingmann's behavior had on Daughter. Neither argument is persuasive.[5]

#### A. Lingmann's Sentence Was Not Excessive.

¶ 34 "In determining whether state offenses are to run concurrently or consecutively," courts must "consider the gravity and circumstances of the offenses, the number of victims, and the history, character, and rehabilitative needs of the defendant." Utah Code Ann. § 76–3–401(2) (LexisNexis 2012). We will reverse a court's

---

**5.** Overlaying Lingmann's challenge to his sentence is a concern that his "trial and sentencing were presided over by different judges," so "the sentencing court was unfamiliar with the evidence and particular circumstances of Lingmann's trial." Lingmann asked the sentencing judge to recuse herself, citing the fact that she had presided over Lingmann's 2009 trial for stalking and sex offenses. He raises the same concern on appeal and cites an American Bar Association guideline in support. *See* ABA Standards for Criminal Justice: Sentencing, 18–5.13 (3d ed.1994) (recommending that "the judge who presided in the guilt determination phase of a

case should, if feasible, be the judge to preside in sentencing proceedings"). But Lingmann has not directed us to any authority that supports his position that this fatally undermined the integrity of his sentencing proceedings. *See Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d 903 ("An appellate court is not a depository in which [a party] may dump the burden of argument and research." (alteration in original) (citation and internal quotation marks omitted)). And the ABA standard itself, even if applicable here, is itself conditional. We are not persuaded that the change in judge before sentencing resulted in any material prejudice to Lingmann.

sentencing decision if "it fails to consider all legally relevant factors or if the sentence imposed is clearly excessive." *State v. Valdovinos*, 2003 UT App 432, ¶ 28, 82 P.3d 1167 (citation and internal quotation marks omitted); *see also State v. Killpack*, 2008 UT 49, ¶ 59, 191 P.3d 17. A sentence is clearly excessive only "if it can be said that no reasonable [person] would take the view adopted by the trial court." *Valdovinos*, 2003 UT App 432, ¶ 14, 82 P.3d 1167 (alteration in original) (citations and internal quotation marks omitted).

¶ 35 In making sentencing determinations, judges have no obligation to make findings of fact, and we generally presume that the district court appropriately considered all the relevant evidence and statutory factors. *State v. Moa*, 2012 UT 28, ¶ 35, 282 P.3d 985. In *State v. Helms*, 2002 UT 12, 40 P.3d 626, the Utah Supreme Court affirmed the imposition of consecutive sentences despite a sentencing order that was "lacking in detail." *Id.* ¶ 12. It determined that because the presentence report contained sufficient information to support the court's ultimate decision and the district court indicated on the record that it had reviewed the report, the defendant had not met his burden of showing that his sentence was imposed in error. *Id.* ¶¶ 13, 16.

¶ 36 The evidence before the sentencing court in this case adequately supported its decision to impose consecutive sentences. After hearing argument from the State and from Lingmann's attorney, the judge indicated that she had "read the presentence report and reviewed everything for [the sentencing] hearing." The report (PSR) detailed Lingmann's criminal history, which now included ten felony convictions, and it discussed in some depth the jailhouse conversations that led to Lingmann's convictions for criminal solicitation. The PSR noted that even though Lingmann had taken some responsibility for his actions, he still seemed to "shift[ ] blame for his crimes to [Cellmate], referring to him as the 'snitch' and that he 'kept feeding me with the taking care of my victim bit.' " The PSR also discussed Lingmann's sex-offense convictions and several instances in which Lingmann had sent

Daughter pornographic images during their relationship, some of himself and many that involved children. And it contained detailed information about Lingmann's family history, education and employment, and alcohol and drug history. Mother also testified at Lingmann's sentencing hearing and stated that her family lived in constant fear as a result of Lingmann's conduct. She described the emotional damage Lingmann's behavior inflicted on her family, requiring her daughters to seek counseling. Before imposing sentence, the judge noted several aggravating factors: "repetitive criminal conduct that occurred within a short time after Mr. Lingmann was arrested," "violent behavior" that "escalated ... rather quickly after his arrest," "a crime that is characterized by extreme cruelty or depravity," "multiple victims," and the fact that Lingmann still blamed "other individuals or witnesses in this case" for his crimes. The judge also specifically found that Lingmann had "severely traumatized" and "terrorized" Daughter during a time in which she was "particularly vulnerable." The court thus had sufficient information to adequately consider Lingmann's "history, character, and rehabilitative needs," as well as "the gravity and circumstances of the offenses" and "the number of victims," and we can presume that it did so. *See* Utah Code Ann. § 76–3–401(2); *supra* ¶ 35.

¶ 37 Lingmann asserts, however, that there is no indication the trial court "paid any consideration" to "the fact that [he] was being sentenced for an inchoate crime." This is simply not accurate, as the PSR discusses at length the circumstances that led to Lingmann's convictions. *See State v. Schweitzer*, 943 P.2d 649, 652 (Utah Ct.App. 1997) (affirming the imposition of consecutive sentences because evidence of pertinent sentencing factors was in the record and the "defendant [did] not show that the trial court failed to consider" each factor). Lingmann also cites authority from other jurisdictions that he argues prohibits multiple convictions for inchoate acts intended to result in a single crime. *See, e.g., Wyatt v. Commonwealth*, 219 S.W.3d 751, 761 (Ky.2007) ("[W]here the object of a single act of en-

couragement is to commit one or many crimes, it is the act of encouragement which the solicitation statute punishes."). *But see Meyer v. State*, 47 Md.App. 679, 425 A.2d 664, 670 (1981) (rejecting "the notion that merely because there is but one solicitor, one solicitee, and one conversation, only one solicitation can arise"). But Lingmann does not challenge the validity of his six separate criminal solicitation convictions. Nor does he even address the effect of Utah law that expressly allows for the imposition of "consecutive sentences for offenses arising out of a single criminal episode." *See* Utah Code Ann. § 76-3-401(5); *see also id.* § 76-1-401 (defining a " 'single criminal episode' " as "all conduct which is closely related in time and is incident to an attempt or an accomplishment of a single criminal objective"). As a consequence, Lingmann has failed to carry his burden to show that the court's imposition of consecutive sentences was inappropriate or excessive.

### B. Lingmann Has Not Shown that His Sentence Was Based on Unreliable or Irrelevant Evidence.

¶ 38 Lingmann also argues that the court's sentencing decision was an abuse of discretion because the court considered "unreliable and irrelevant information." In particular, he objects to the prosecutor's assertion at the sentencing hearing that Lingmann had given Daughter drugs, discussion of Lingmann's admission that he sexually abused a six-year-old child, and other references to the circumstances surrounding Lingmann's prior sex-offense convictions. In support of his argument, Lingmann points out that the trial court excluded much of this evidence at trial.

 ¶ 39 "[E]vidence that is inadmissible during the guilt phase of a trial," however, "may be admissible for sentencing purposes." *State v. Epling*, 2011 UT App 229, ¶ 12, 262 P.3d 440 (citation and internal quotation marks omitted). Utah law requires courts to consider "the history, character, and rehabilitative needs of the defendant" when deciding whether to impose consecutive or concurrent felony sentences. Utah Code Ann. § 76-3-401(1), (2) (LexisNexis 2012). This includes the defendant's criminal history, conduct at trial, and other relevant behavior. *See, e.g., Epling*, 2011 UT App 229, ¶¶ 1, 18, 262 P.3d 440 (affirming the imposition of consecutive sentences for child sexual abuse where the trial court considered the defendant's pornography use); *State v. Jackson*, 2010 UT App 328, ¶¶ 24–25, 243 P.3d 902 (affirming the imposition of consecutive sentences in convictions for attempted murder of the defendant's ex-girlfriend and her son where the trial court considered the fact that defendant had been convicted previously of killing his wife and violating his parole); *State v. Alfatlawi*, 2006 UT App 511, ¶¶ 9, 51, 153 P.3d 804 (affirming a consecutive sentencing decision where the trial court considered the defendant's "bad attitude" and "diatribe of threats and obscenities" during court proceedings).

 ¶ 40 To show that a judge relied on unreliable or irrelevant information at sentencing, the defendant must show "(1) evidence of reliance, such as an affirmative representation in the record that the judge actually relied on the specific information in reaching her decision, and (2) that the information she relied upon was irrelevant." *State v. Moa*, 2012 UT 28, ¶ 35, 282 P.3d 985. Lingmann has not shown that the judge's sentencing decision was based on irrelevant information. Indeed, evidence of Lingmann's prior convictions, his admission to investigators that he sexually abused a small child, and the fact that he gave Daughter drugs were all discussed in the PSR and were relevant to his history, character, and need for rehabilitation. Lingmann's sex-offenses—which were perpetrated against one of the same victims in this case—were of particular relevance considering the short duration and relationship between them and his criminal solicitation convictions. Similarly, Lingmann's admission to investigators that he had sexually abused a six-year-old child, coupled with other evidence in the PSR of his affinity for child pornography, demonstrated the potential danger he posed to society as well as his need for rehabilitation, particularly when considered in the context of the aggravated murder solicitation convictions. And if the PSR is accurate that Lingmann provided Daughter with drugs in

addition to sexually abusing her—a fact Lingmann denied at trial—that fact is also relevant to Lingmann's character and need for rehabilitation.

¶41 Beyond Lingmann's denial at trial that he gave Daughter drugs and conclusory assertions that some of this information was inaccurate, Lingmann does not discuss the contents of the PSR on appeal, nor does he identify any evidence of substance that undermines its reliability. *See id.* ¶36 ("[T]he defendant must demonstrate that the information [the court relied on] was unreliable or irrelevant."). Lingmann does not deny sexually abusing a six-year-old child, nor does he deny other aspects of his 2009 sex-offense convictions that were discussed in the PSR. He does argue that there was no evidence to support the State's assertion that Lingmann gave Daughter drugs. The lead investigator in the sex-offense case, however, stated in the PSR that "Lingmann had been sexually abusing and providing unlawful controlled substances to [Daughter] for several years." And Lingmann did not challenge that statement—or anything else in the PSR—in the district court. *See* Utah Code Ann. § 77-18-1(6)(a) (LexisNexis 2012) ("Any alleged inaccuracies in the presentence investigation report . . . shall be brought to the attention of the sentencing judge, and the judge may grant an additional 10 working days to resolve the alleged inaccuracies of the report with the department."). To the extent that Lingmann now argues the statement is inaccurate, that issue is unpreserved. *See State v. Losee,* 2012 UT App 213, ¶28, 283 P.3d 1055 ("This issue was not raised before the trial court, and thus it is unpreserved."). As a result, Lingmann has not demonstrated that his sentence was based on unreliable or irrelevant evidence.

## CONCLUSION

¶42 We conclude that Lingmann received effective assistance of counsel because his trial counsel pursued a reasonable trial strategy in light of the evidence and an unsettled question of Utah law. We also conclude that the evidence supported all six convictions for solicitation to commit aggravated murder and that the imposition of consecutive sentences was not an abuse of discretion. We therefore affirm.