2014 UT App 56

STATE of Utah, Plaintiff and Appellee,

v.

Jason Kyle CLARK, Defendant and Appellant.

No. 20110206–CA.

Court of Appeals of Utah.

March 13, 2014.

Lori J. Seppi, for Appellant.

Sean D. Reyes and Christopher D. Ballard, for Appellee.

Judge MICHELE M. CHRISTIANSEN authored this Opinion, in which Judges CAROLYN B. McHUGH and STEPHEN L. ROTH concurred.

## Opinion

CHRISTIANSEN, Judge:

¶ 1 Defendant Jason Kyle Clark appeals his first degree felony convictions for various counts of aggravated murder, attempted aggravated murder, aggravated burglary, aggravated kidnapping, and aggravated robbery, and his class B misdemeanor conviction for aggravated cruelty to animals. We affirm on all counts.

## BACKGROUND

¶ 2 "On appeal from a jury verdict, we view the evidence and all reasonable inferences in a light most favorable to that verdict and recite the facts accordingly." *State v. Pinder*, 2005 UT 15, ¶ 2, 114 P.3d 551 (citation and internal quotation marks omitted).

¶ 3 On April 29, 2007, Daniel Blankenship arrived at the Salt Lake City home of A.S. to settle a drug-related dispute. Blankenship was accompanied by two men, Defendant and

an unidentified third man. Blankenship entered the home first and talked with A.S. alone while the other men waited outside. Defendant and the third man entered the home with guns drawn shortly thereafter.

¶ 4 Defendant proceeded to question A.S. about a confrontation that had occurred a few days earlier between the stepson of Defendant's girlfriend and two of A.S.'s associates, D.L. and K.K. During the questioning, Defendant yelled at A.S. and struck her on the top of her head with the butt of his gun, and the third man burned A.S. several times with a cigarette and forced her "to take a hit off" a "crack pipe." When A.S.'s cell phone rang in another room, one of the men retrieved the phone and A.S. never got it back.

¶ 5 After some time, D.L. and K.K. arrived at A.S.'s home and knocked on the door. The men instructed A.S. to open the door to allow D.L. and K.K. in. When D.L. and K.K. entered the home, the men took D.L.'s cell phone, which she also never got back. The third man directed D.L. to sit next to A.S. on a couch and directed K.K. to sit in a recliner near the door. The third man then began questioning D.L. and K.K. about the prior confrontation with the stepson of Defendant's girlfriend. At one point, the men instructed K.K. to put a towel in his mouth. When K.K. refused, a struggle ensued between K.K., Defendant, and the third man. During the struggle, Defendant shot K.K. in the head, killing him. After Defendant shot K.K., both Blankenship and the third man ran out the front door. Before fleeing the scene, Defendant shot A.S. eight times. He then turned the gun on D.L., shooting her seven times. Both A.S. and D.L. survived. Defendant also shot and killed A.S.'s service dog during the incident. After the three men left, A.S. and D.L. managed to exit through the back of the house and call for help. We hereinafter refer to these events as the Salt Lake shooting.

¶ 6 Both A.S. and D.L. later identified Defendant and Blankenship in separate pho-

to lineups conducted by the police. The police arrested Defendant a few days later after a traffic stop. Defendant was a passenger in the front seat of the stopped vehicle. The police found a black semi-automatic .40–caliber Beretta handgun on the front passenger floor of the vehicle. The police also discovered a holster inside Defendant's front waistband. At trial, the State presented evidence from a firearms-identification expert, David Wakefield, linking the Beretta found with Defendant at the time of his arrest to the weapon used in the Salt Lake shooting. The State's evidence also linked the Beretta to a shooting incident involving Defendant that had occurred on March 12, 2007, in West Valley City (the West Valley shooting)—about six weeks before the Salt Lake shooting.

¶ 7 The State charged Defendant with eight first degree felonies and one class B misdemeanor. Prior to trial, the trial court denied Defendant's motion to exclude Wakefield's firearm-identification testimony; granted the State's motion to exclude Defendant's designated firearms-identification expert, David Lamagna, from testifying; granted the State's motion to admit evidence of Defendant's role in the West Valley shooting pursuant to rule 404(b) of the Utah Rules of Evidence; and denied Defendant's motion to suppress the eyewitness-identification testimony of both A.S. and D.L. At the close of the trial, a jury convicted Defendant on all counts. The trial court sentenced Defendant to indeterminate prison terms totaling eighty years to life.[1] Defendant timely appeals.

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 8 Defendant raises six principal claims on appeal. First, Defendant argues that the trial court erred by refusing to exclude or limit the State's firearm-identification expert testimony. In the alternative, he argues that the court erred by excluding the

1. The trial court sentenced Defendant as follows: count 1, aggravated murder, twenty years to life; counts 2 and 3, attempted aggravated murder, five years to life on each count; count 4, aggravated burglary, five years to life; counts 5, 6, and 7, aggravated kidnapping, fifteen years to life on each count; count 8, aggravated robbery, five

years to life; and count 9, aggravated cruelty to animals, 180 days. The court ordered the sentences for counts 1 through 7 to run consecutively to each other and count 8 to run concurrently to count 7. The court suspended the sentence for count 9.

firearm-identification testimony of Defendant's expert witness. "We review a trial court's decision to admit expert testimony for an abuse of discretion and find error only if no reasonable person would take the view the trial court adopted." *State v. Maestas*, 2012 UT 46, ¶ 122, 299 P.3d 892.

¶ 9 Next, Defendant contends that the trial court improperly admitted other-acts evidence pursuant to rule 404(b) of the Utah Rules of Evidence. The State sought to introduce evidence that the handgun Defendant had used in the West Valley shooting was the same weapon used in the Salt Lake shooting. The court allowed the State to introduce this evidence to prove Defendant's identity in the Salt Lake shooting. "A trial court's admission of prior bad acts evidence is reviewed for abuse of discretion, but the evidence must be scrupulously examined by trial judges in the proper exercise of that discretion." *State v. Verde*, 2012 UT 60, ¶ 13, 296 P.3d 673 (citation and internal quotation marks omitted).

¶ 10 Third, Defendant argues that the State prosecutor committed misconduct during his closing rebuttal. "We review a trial court's handling of claimed prosecutorial misconduct for an abuse of discretion." *State v. King*, 2010 UT App 396, ¶ 13, 248 P.3d 984. Where timely objections to particular statements were not made below, Defendant must establish either plain error or ineffective assistance of counsel to merit reversal. *See State v. Lee*, 2006 UT 5, ¶ 24, 128 P.3d 1179.

¶ 11 Fourth, Defendant challenges the trial court's denial of his motion to suppress A.S.'s and D.L.'s eyewitness identifications of Defendant. When reviewing a trial court's decision to admit eyewitness identification evidence, we "defer to the trial court's fact-finding role by viewing the facts in the light most favorable to the trial court's decision to admit and by reversing its factual findings only if they are against the clear weight of the evidence." *State v. Ramirez*, 817 P.2d 774, 782 (Utah 1991). The trial court's ultimate determination of "whether the[ ] facts are sufficient to demonstrate reliability" is a legal conclusion that we review for correctness. *Id.*

¶ 12 Defendant next argues that the trial court erred by failing to properly instruct the jury on accomplice liability and by providing flawed instructions on the aggravated robbery and aggravated cruelty to animals counts. "Claims of erroneous jury instructions present questions of law that we review for correctness." *State v. Jeffs*, 2010 UT 49, ¶ 16, 243 P.3d 1250. We therefore review "the instructions given to the jury without deference to the trial court." *Id.*

¶ 13 Finally, Defendant argues that the cumulative effect of the trial court's alleged errors merits reversal of his convictions. Under the cumulative error doctrine, we must first "apply the standard of review applicable to each underlying claim of error" to determine if error occurred. *Radman v. Flanders Corp.*, 2007 UT App 351, ¶ 4, 172 P.3d 668. We will reverse a conviction only if the cumulative effect of all identified and assumed errors undermines our confidence in the essential fairness of the defendant's trial. *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993).

## ANALYSIS

### I. Firearm–Identification Expert Testimony

¶ 14 Defendant argued before the trial court that the firearm-identification testimony offered by the State's expert, Wakefield, was unreliable and therefore inadmissible as expert testimony. *See* Utah R. Evid. 702(b)(2) ("Scientific, technical, or other specialized knowledge may serve as the basis for expert testimony only if there is a threshold showing that the principles or methods that are underlying in the testimony . . . are reliable. . . ."). In support of his challenge to the reliability of Wakefield's testimony, Defendant sought to introduce Lamagna's testimony criticizing the reliability of firearm identification. After an evidentiary hearing, the trial court determined that "Lamagna lack[ed] the practical experience and training necessary to be qualified as an expert in the discipline of toolmark and firearms examination." Conversely, the court determined that the "State ha[d] made the threshold showing

that the principles underlying forensic tool-marks examination are reliable and are based upon sufficient facts and data" and that "in the instant case these facts, data, and principles were reliably applied by Mr. Wakefield." Accordingly, the trial court allowed Wakefield's testimony and excluded Lamagna's.

¶ 15 On appeal, Defendant maintains that the trial court's decision to allow Wakefield to testify was an abuse of its discretion. Defendant also argues that the court should have, at the very least, prohibited Wakefield from testifying that he could identify the firearm with absolute certainty. Alternatively, Defendant asserts that the trial court should have admitted Lamagna's counter testimony. However, assuming without deciding that the trial court abused its discretion, we conclude that any error in the admission of Wakefield's testimony or the exclusion of Lamagna's testimony was harmless.

¶ 16 "An error is harmful if it is such that absent the error, there is a sufficiently high likelihood of a different outcome, undermining our confidence in the result." *State v. Honie*, 2002 UT 4, ¶ 54, 57 P.3d 977. Here, neither the exclusion of Wakefield's testimony nor the admission of Lamagna's testimony could have significantly altered the ultimate outcome of the case. The State introduced Wakefield's testimony to establish that the Beretta handgun found in Defendant's possession upon his arrest was the weapon used in both the Salt Lake shooting and the West Valley shooting. The purpose of this evidence was to connect Defendant to the Salt Lake shooting and its attendant crimes, thus rebutting Defendant's claim that he was not involved. However, this was not the only evidence presented by the State linking Defendant to the Salt Lake shooting. The State presented additional direct evidence at trial that established the same facts. Three eyewitnesses—Blankenship, A.S., and D.L.—testified that Defendant was present at the Salt Lake shooting. Both Blankenship

and D.L. testified that Defendant shot K.K. in the head. D.L. testified that Defendant shot her after shooting and killing K.K. Blankenship testified that Defendant later admitted shooting A.S. and D.L., saying that he killed "the women as well." And A.S. testified that Defendant was present at the crime scene with a handgun. This compelling eyewitness testimony would have been sufficient for the jury to convict Defendant on all counts, regardless of whether any expert, including Wakefield or Lamagna, had testified as to the firearms-identification evidence.[2]

¶ 17 Furthermore, during his trial, Defendant never disputed that the Beretta handgun found with him upon his arrest was the same gun used in the Salt Lake shooting and the West Valley shooting. Rather, his defense hinged on his claim that he was not present at the Salt Lake shooting and that Blankenship was the true owner of the Beretta. Defendant claimed that he possessed the Beretta only intermittently· as collateral for loans he made to Blankenship, which explained why he had it in his possession on the day of his arrest. Under cross-examination, Defendant admitted that he used the Beretta in the West Valley shooting and that it was the same gun found in his possession upon his arrest. Finally, it is undisputed that the ammunition used in both the Salt Lake and West Valley shootings—.40-caliber Smith & Wesson bullets manufactured by Winchester—was identical to the ammunition loaded in the Beretta found in Defendant's possession upon his arrest. Thus, the firearm-identification testimony, though helpful in corroborating the witnesses' testimony, was negligible in the context of all of the evidence presented at trial.

¶ 18 This is particularly so because defense counsel's cross-examination of Wakefield sought to undermine Wakefield's testimony and covered many, if not all, of the same points that Lamagna would have made had

---

**2.** We note that in response to a pretrial suppression motion filed by Defendant, the trial court held an evidentiary hearing to determine the reliability of A.S.'s and D.L.'s identifications of Defendant. The trial court concluded that based "upon a careful assessment of all the facts pre-sented and the controlling case law, ... the identifications provided by [A.S. and D.L. were] sufficiently reliable to be admitted at Defendant's trial." As discussed *infra* ¶¶ 38–48, we affirm that ruling.

he testified at trial. *Cf. State v. Hales,* 2007 UT 14, ¶ 80, 152 P.3d 321 (stating that "in many circumstances defense attorneys may reasonably decide to rebut an expert's testimony without hiring a competing expert"). Indeed, as outlined in Defendant's appellate brief, defense counsel "challenged Wakefield's testimony at length and left the jury with reasons to doubt its conclusions." Defense counsel cross-examined Wakefield regarding the subjectivity and fallibility of firearm identification, the technology and testing methods employed by Wakefield, the fact that Wakefield's conclusions were not reviewed by a second examiner, the nature of the professional organization to which Wakefield belonged, the existence of recent studies questioning the reliability of firearm-identification analysis, and the fact that some federal judges have excluded firearm-identification evidence based on supposed unreliability. Additionally, Lamagna could not have directly contradicted Wakefield's opinion that the Beretta handgun was the murder weapon because Lamagna did not actually examine the evidence in this case. Consequently, calling Lamagna to testify could have been more harmful than helpful because, absent any knowledge gained through his own examination of the evidence, Lamagna would have likely had to concede that the Beretta could have been the murder weapon.

¶ 19 Thus, Wakefield's testimony was largely cumulative with the evidence offered at trial, and any weaknesses in Wakefield's opinion that might have been addressed by Lamagna's own testimony were adequately covered during cross-examination—albeit not with counter expert testimony. Accordingly, even if the trial court's rulings on the expert testimony were an abuse of its discretion, an issue we do not reach, any resulting error would have been harmless, in that the outcome of the trial would not have been affected.[3] *See Honie,* 2002 UT 4, ¶ 54, 57 P.3d 977.

¶ 20 Defendant next challenges the trial court's admission of evidence of Defendant's involvement in the West Valley shooting, arguing that this "bad acts" evidence unfairly prejudiced his defense. A party may not introduce at trial "[e]vidence of a crime, wrong, or other act" if that evidence is used "to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). However, this rule allows such evidence to be admitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R.404(b)(2). Thus, evidence is admissible under rule 404(b) if it is offered for a relevant noncharacter purpose, relevant to that purpose, and "does not pose a danger for unfair prejudice that substantially outweighs its probative value." *State v. Killpack,* 2008 UT 49, ¶ 45, 191 P.3d 17 (citation and internal quotation marks omitted); *see also* Utah R. Evid. 403. "In determining whether a trial court has exceeded its discretion in admitting evidence under rule 404(b), '[w]e review the record to determine whether the admission of other bad acts evidence was scrupulously examined by the trial judge in the proper exercise of that discretion.'" *State v. Losee,* 2012 UT App 213, ¶ 16, 283 P.3d 1055 (alteration in original) (quoting *State v. Nelson–Waggoner,* 2000 UT 59, ¶ 16, 6 P.3d 1120).

¶ 21 Before trial, the State moved to admit evidence pursuant to rule 404(b) relating to Defendant's involvement in the West Valley shooting. The trial court held an evidentiary hearing for the purpose of hearing the evidence related to Defendant's role in the West Valley shooting. The court later heard oral arguments and issued a written decision granting the State's motion. The court ruled that evidence of the prior shooting helped to "establish that the identity of the person who

---

**3.** Defendant also challenges Wakefield's testimony under rule 403 of the Utah Rules of Evidence, arguing that its probative value was substantially outweighed by the danger of unfair prejudice and misleading the jury. *See* Utah R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). However, Defendant's argument on this point is unpersuasive and does not merit further discussion in light of our resolution of his primary challenge to the firearm-identification evidence. *See Carter v. State,* 2012 UT 69, ¶ 16 n. 7, 289 P.3d 542.

caused the death of [K.K.] is Defendant." The court reasoned that if "it were shown that on March 12, 2007, Defendant shot [the victim in the West Valley shooting] with the same firearm that was used to shoot [K.K.] on April 29, 2007, then this fact would help to establish that Defendant was the person who shot and killed [K.K.]." Thus, the court concluded that the West Valley shooting evidence would be relevant and offered for the proper noncharacter purpose of identification.

¶ 22 Based upon Defendant's assertion that he was not present at the Salt Lake shooting, identity of the perpetrator was clearly at issue in this case. Accordingly, the details of the West Valley shooting were relevant to show both that the Beretta handgun belonged to Defendant and that he was present at the Salt Lake shooting. *Cf. Salt Lake City v. Alires*, 2000 UT App 244, ¶¶ 10–15, 9 P.3d 769 (holding that where the "facts suggest a clear factual link between the two incidents," evidence of a defendant's earlier visit and disturbance at a victim's apartment was relevant and admissible to prove the defendant's identity in a telephone harassment prosecution because "[i]dentity of the caller was clearly at issue in [the] case"). Evidence that Defendant was carrying the Beretta handgun when he arrived at the scene of the West Valley shooting, that he displayed a familiarity with the handgun's operation, and that he actually used the handgun in that incident all tend to show that the handgun was actually his. Indeed, the State argued that the 404(b) evidence

was necessary to rebut "[D]efendant's claim that he bought the gun [from Blankenship] after the [Salt Lake] shooting." The evidence also helped rebut Defendant's explanation that he was merely keeping the Beretta as collateral for a loan he had made to Blankenship. Thus, we agree with the trial court's assessment that evidence of Defendant's involvement in the West Valley shooting was both relevant and offered for a proper noncharacter purpose—identification of Defendant as the person who used the same firearm to commit two shootings.

 ¶ 23 In evaluating whether the 404(b) evidence posed a danger of unfair prejudice that substantially outweighed its probative value, the trial court considered the following six factors which have become known as the *Shickles* factors: (1) the strength of the evidence as to the commission of the other crime, (2) the similarities between the crimes, (3) the interval of time that has elapsed between the crimes, (4) the need for the evidence, (5) the efficacy of alternative proof, (6) and the degree to which the evidence probably will rouse the jury to overmastering hostility. *State v. Decorso*, 1999 UT 57, ¶ 29, 993 P.2d 837 (citing *State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988), *abrogated on other grounds by State v. Doporto*, 935 P.2d 484 (Utah 1997)).[4]

¶ 24 The trial court's analysis of the *Shickles* factors is both thorough and convincing. In analyzing the first factor, the court determined that the strength of the 404(b) evidence was "sufficiently high to warrant ad-

4. Approximately two years after the trial court evaluated the State's 404(b) motion using the *Shickles* factors, our supreme court in *State v. Verde*, 2012 UT 60, 296 P.3d 673, articulated an analytical framework under which a trial court should assess the probative value of other acts evidence when such evidence logically falls within the "doctrine of chances." *Id.* ¶¶ 57–61. "This doctrine defines circumstances where prior or bad acts can properly be used to rebut a charge of fabrication. It is a theory of logical relevance that rests on the objective improbability of the same rare misfortune befalling one individual over and over." *Id.* ¶ 47 (citation and internal quotation marks omitted); *see also State v. Bedell*, 2014 UT 1, ¶ 24 n. 24. While recognizing that the trial court did not have the benefit of *Verde* when it ruled on the State's 404(b) motion, we note that when "addressing the probative

value of the other acts evidence in cases *not governed* by the doctrine of chances," as is the case here, "the *Shickles* factors remain relevant." *State v. Labrum*, 2014 UT App 5, ¶ 28, 318 P.3d 1151 (emphasis added). "[T]he trial court should carefully weigh the tendency toward proper and improper inferences from the other acts evidence in the context of the particular case and consider whatever factors are relevant to that analysis as it 'scrupulously examine[s]' the evidence." *Id.* (second alteration in original) (quoting *Verde*, 2012 UT 60, ¶ 13, 296 P.3d 673). In this case, even if additional factors would have been helpful to the trial court's analysis, the court's thorough and convincing application of the *Shickles* factors supports the court's conclusion that the West Valley shooting evidence did not pose a danger of unfair prejudice that substantially outweighed its probative value.

mission" because the State's eyewitness "provided credible testimony that it was Defendant who [went to the scene of the West Valley shooting], that he brandished a gun, that he exited the home, and that he shot [the West Valley victim]."[5] Under the third factor, the court observed that "the interval of time between the two shooting[s] was short, i.e., 42 day[s]." *See Nelson–Waggoner*, 2000 UT 59, ¶ 29, 6 P.3d 1120 (stating that the time between the defendant's prior offenses and the charged conduct "was a *brief* ten weeks" (emphasis added)); *Decorso*, 1999 UT 57, ¶ 32, 993 P.2d 837 (describing a seven-month interval as "relatively short"). With respect to the fourth and fifth factors, the trial court characterized the need for the evidence as either "moderate" or higher depending on how the credibility of the eyewitness testimony unfolded at trial. As for the final factor, the trial court concluded that it was "unlikely that evidence of the prior shooting incident will rouse the jury to overmastering hostility toward Defendant and cause jurors to punish him simply because he was involved in another shooting," particularly where the events of the Salt Lake shooting were more "egregious" than those of the West Valley shooting.

¶ 25 The trial court's analysis of the second factor—the similarities between the crimes—is reasonable as well. The trial court stated that

> although there are no "signature-like" aspects involved in the two shootings, they are sufficiently similar to warrant admission. In the present case Defendant entered the home of [A.S.] and was angry about a friend of his being hurt. He brandished a gun, made threats, shot [K.K.], shot [A.S.] and [D.L.], and then fled the scene. In the prior shooting, [the eyewitness] testified that Defendant entered her home, an altercation erupted between Defendant and others, he pulled out a gun, and made threats. Once Defendant was

outside, he shot [the victim] and then fled the scene.

We acknowledge that evidence of the similarity between crimes "may realistically be expected to convey a simultaneous inference that the person behaved improperly in the past and might be likely to do so again in the future." *See State v. Verde*, 2012 UT 60, ¶ 16, 296 P.3d 673. Here, however, this factor demonstrates that the probative value of the evidence outweighs the possible unfairly prejudicial effect from its admission and also further establishes the noncharacter purpose—identity—for which the evidence was offered. *See Decorso*, 1999 UT 57, ¶ 27, 993 P.2d 837 (stating that "the evidence was offered for a proper, noncharacter purpose—i.e., to establish the identity of [the] killer," that "[i]dentity was the crux of [the] case," and that there were "numerous similarities between the crimes").

¶ 26 Based on our review of the record, it is clear that the trial court "scrupulously examined" the 404(b) evidence in the "proper exercise of [its] discretion." *See Verde*, 2012 UT 60, ¶ 13, 296 P.3d 673 (citation and internal quotation marks omitted). In addition to holding an evidentiary hearing and affording the parties an opportunity to be heard, the court stated that it had "thoroughly reviewed the parties' memoranda, the relevant case law, and all applicable rules and statutory provisions" relating to the 404(b) evidence. The trial court "carefully considered the evidence presented" and "the oral arguments provided by counsel" prior to issuing its detailed written decision addressing each factor of the 404(b) analysis. In other words, it is evident that the trial court "undertook the level of thoughtful consideration required under rule 404(b)." *See State v. Losee*, 2012 UT App 213, ¶ 26, 283 P.3d 1055. Furthermore, the conclusion it reached was reasonable. Therefore, we conclude that the trial court did not abuse its discretion in granting the State's motion to admit the 404(b) evidence.[6]

---

**5.** At trial, Defendant admitted to using the Beretta in the West Valley shooting, both on direct and cross-examination. He claimed that he was acting in self-defense.

**6.** Our holding on this point does not conflict with our conclusion that the trial court's rulings on

the firearm-identification expert testimony were harmless. We reached that conclusion by evaluating the entirety of the trial proceedings and all evidence actually presented to the jury. Review in this manner is necessary to assess whether the trial court's rulings, assuming without deciding

### III. Prosecutorial Misconduct

¶ 27 Defendant next argues that the prosecutor engaged in misconduct during his rebuttal to defense counsel's closing argument. Defendant identifies numerous comments made by the prosecutor that, according to Defendant, merit reversal of Defendant's convictions.

¶ 28 As an initial matter, the parties dispute whether Defendant adequately preserved his claim of prosecutorial misconduct for appeal. "[I]n order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (alterations in original) (citation and internal quotation marks omitted). After the prosecutor finished his rebuttal, defense counsel requested that the trial judge declare a mistrial on the ground that the prosecutor improperly argued that defense counsel and Defendant did not believe their own defense. The prosecutor made this comment in the context of discussing several out-of-court witness statements introduced by Defendant. Defendant argued that these statements supported his claim that he was not present at the Salt Lake shooting. After reviewing the transcript, the court denied Defendant's motion. Our review of the record reveals no other objections to the prosecutor's closing argument or rebuttal. Thus, of the various comments that Defendant criticizes on appeal, only his objection to this comment is preserved for review. Nevertheless, Defendant argues that the remaining comments should be reviewed for plain error or under a theory of ineffective assistance of counsel.

¶ 29 A prosecutor's "remarks constitute misconduct meriting reversal if they call to the attention of the jurors matters they would not be justified in considering in determining their verdict and ... the error is substantial and prejudicial such that there is a reasonable likelihood that in its absence, there would have been a more favorable result for the defendant." *State v. Maestas*, 2012 UT 46, ¶ 159, 299 P.3d 892 (omission in original) (citation and internal quotation marks omitted); *see also* Utah R.Crim. P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded."). "In assessing whether allowing the prosecution's comments was a harmful error, we will consider the comments both in context of the arguments advanced by both sides as well as in context of all the evidence." *Maestas*, 2012 UT 46, ¶ 159, 299 P.3d 892 (citation and internal quotation marks omitted). Furthermore, "in argument to the jury, counsel for each side has considerable latitude and may discuss fully from their viewpoints the evidence and the inferences and deductions arising therefrom." *State v. Tillman*, 750 P.2d 546, 560 (Utah 1987). Consequently, " '[a] prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation.' " *State v. Bryant*, 965 P.2d 539, 550 (Utah Ct.App. 1998) (alteration in original) (quoting *United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992)).

¶ 30 Here, the parties dispute which standard of harmlessness applies to a preserved claim of prosecutorial misconduct and which party bears the burden of proving harm. Defendant argues that because "[p]rosecutorial misconduct claims are based on the defendant's constitutional rights to due process and to confront witnesses against him," "the State must show that the error was harmless beyond a reasonable doubt." (Citations and internal quotation marks omitted.) *See State v. Ross*, 2007 UT 89, ¶ 54, 174 P.3d 628. On the other hand, the State argues that it "is well-settled that in most cases the defendant bears the burden on appeal to prove that any prosecutorial misconduct prejudiced him, i.e., that absent the alleged misconduct, there is a reasonable probability of a more favorable outcome." *See, e.g., State v. Bakalov*, 1999 UT 45, ¶ 56, 979 P.2d 799; *State v. Lafferty*, 749 P.2d 1239, 1255 & n. 13 (Utah 1988).

---

they were error, resulted in a "sufficiently high likelihood of a different outcome" of Defendant's trial. *See Honie*, 2002 UT 4, ¶ 54, 57 P.3d 977. By contrast, we review the trial court's 404(b) ruling for an abuse of discretion based on the circumstances in place at the time the court so ruled—which in this case was prior to trial, before any evidence was presented to the jury.

Because we determine that the prosecutor's comment that defense counsel and Defendant did not believe their own defense was harmless beyond a reasonable doubt, we need not address this alleged inconsistency in the law. *Cf. State v. Wright*, 2013 UT App 142, ¶ 41 n. 6, 304 P.3d 887 (applying a similar approach in the context of an unpreserved claim of prosecutorial misconduct).

¶ 31 To establish that the prosecutor's remaining comments constitute plain error, Defendant must show the following: "(i) An error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant...."[7] *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993). To establish ineffective assistance of counsel, Defendant "must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We note, however, that "[f]ailure to raise futile objections does not constitute ineffective assistance of counsel." *State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546. Accordingly, if we conclude that none of the prosecutor's remaining comments were improper, then Defendant cannot establish either plain error or ineffective assistance of counsel.

A. The Prosecutor's Comment Regarding the Out-of-Court Statements Introduced by Defendant

¶ 32 During his rebuttal, the prosecutor observed that Defendant's defense hinged on his claim that he was not present at the Salt Lake shooting. He then argued that in an attempt to "prop[ ] up" this claim, Defendant introduced several out-of-court statements "that really mean nothing." For example, the prosecutor cited witness testimony that referenced a "cream colored Cadillac" that had allegedly left the crime scene shortly after the Salt Lake shooting. The prosecutor asserted that these statements had "no bearing on whether the Defendant was there or not there." He then said, "I submit to you the reason [defense counsel and Defendant are] bringing them up is A: Confuse you. Or B: Is they don't believe their defense."

¶ 33 Defendant argues that this comment was improper because it accused Defendant and defense counsel of "conspiring to fabricate the defense and to confuse the jury with unimportant evidence." While the State concedes that this comment was "clumsily phrased," it argues that the comment, when considered in context, was a permissible response to defense counsel's closing argument in which defense counsel emphasized the importance of the out-of-court statements suggesting that somebody else was responsible for the Salt Lake shooting. In other words, the State maintains that the prosecutor's comment was an attempt to show the jury that the primary defense theory was not as robust as defense counsel would have had the jury believe. In analyzing the prosecutor's comment, we will separately address each part—"A: Confuse you"[8] and "B: Is they don't believe their defense."

---

7. We acknowledge that the "case law is not entirely clear" with respect to the harmlessness standard and who bears the burden of proof for unpreserved claims of prosecutorial misconduct in the plain error context. *See State v. Cox*, 2012 UT App 234, ¶ 15 n. 2, 286 P.3d 15 (Voros, J., concurring in part and concurring in the result in part). However, because we ultimately conclude that none of the remaining comments challenged by Defendant were improper, we need not address this issue.

8. The record indicates that Defendant did not specifically object to the "Confuse you" part of the prosecutor's comment, and the trial court made no specific reference to it in ruling on the objection. However, the court reporter repeated the entire comment, including the "Confuse you" part, to the trial judge as the judge considered Defendant's objection. Thus, it is unclear whether the issue of the impropriety of the "Confuse you" remark was "presented to the trial court in such a way that the trial court ha[d] an opportunity to rule on that issue," *see 438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801, and, therefore, whether this issue is preserved for our review. Nevertheless, because we are convinced that this part of the prosecutor's comment was harmless beyond a reasonable doubt, the claim would fail regardless of whether we review it as a preserved claim or under plain error or ineffective assistance of counsel.

¶ 34 Regarding part "B" of the prosecutor's comment—that defense counsel and Defendant did not believe their own defense—review of the comment does not suggest that the prosecutor expressed his personal opinion that *he* did not believe the Defendant's defense. "[A] prosecutor engages in misconduct when he or she expresses personal opinion or asserts personal knowledge of the facts." *State v. Bakalov,* 1999 UT 45, ¶ 57, 979 P.2d 799. Nevertheless, this comment is troublesome because it cast "uncalled for aspersions on defense counsel" and "direct[ed] the jury's attention to an irrelevant factor." *See People v. Thompson,* 45 Cal.3d 86, 246 Cal.Rptr. 245, 753 P.2d 37, 52 (1988) (In Bank). Under these circumstances, the prosecutor's comment called "to the attention of the jurors matters they would *not be justified* in considering in determining their verdict." *State v. Maestas,* 2012 UT 46, ¶ 159, 299 P.3d 892 (citation and internal quotation marks omitted); *see also Thompson,* 246 Cal.Rptr. 245, 753 P.2d at 52 ("[I]t is ... improper for the prosecutor to argue to the jury that defense counsel does not believe in his client's defense."). Nevertheless, we conclude that the prosecutor's remark, while improper, was harmless beyond a reasonable doubt because it was a singular, isolated statement and was not the focus of the prosecutor's argument. Rather, the prosecutor's closing argument and rebuttal centered on the compelling and overwhelming evidence of Defendant's guilt and how the evidence submitted at trial rebutted the evidence presented by Defendant.

¶ 35 With respect to part "A" of the prosecutor's comment—that defense counsel and Defendant introduced the out-of-court statements to confuse the jury—we recently held that prosecutorial misconduct resulted where a prosecutor "argued that defense counsel *intended* to mislead the jury." *State v. Campos,* 2013 UT App 213, ¶ 57, 309 P.3d 1160. "Arguing that the evidence does not support the defense theory and that the theory is thus a distraction from the ultimate issue is fundamentally different from arguing that defense counsel is intentionally trying to distract and mislead the jury." *Id.* ¶ 57. The latter "crosse[s] the line from permissible argument of the evi-dence to an impermissible attack on defense counsel's character." *Id.* Here, the prosecutor said to the jury, "I submit to you the reason they're bringing [the out-of-court statements] up is A: Confuse you...." While it may be a close call, we determine that the prosecutor's remark was improper because it suggested to the jury that defense counsel and Defendant introduced the out-of-court statements as a means of intentionally confusing or misleading the jury. However, when evaluated in the context of the prosecutor's closing argument and rebuttal, this part of the prosecutor's comment was harmless beyond a reasonable doubt for the same reasons articulated above.

## B. The Prosecutor's Remaining Comments

¶ 36 Defendant argues that the following comments made by the prosecutor also constitute prosecutorial misconduct because, according to Defendant, they "undermined [Defendant's] right to a fair trial because they denigrated the defense, resorted to name calling, and commented on [Defendant's] credibility." These comments were that Defendant had a motive to lie because he was "the shooter" and "ha[d] nothing to lose," that Defendant's story about how he obtained the murder weapon as collateral for a loan was a "fabrication," and that Defendant's claim that A.S.'s identification was mistaken was "simply an absurdity." In addition, the following comments made by the prosecutor during his rebuttal, according to Defendant, also denied him his right to a fair trial: that "logic" supported the State's theory that the Beretta handgun belonged to Defendant and that the maxim of "Occam's razor" should be employed to find that the State's theory was "the right one" because it was "the simplest"; that Defendant's explanation of why he was arrested with the murder weapon was "convoluted and tortured"; and that Defendant's theory of the case was a story that the "defense would have [the jury] believe." Defendant also claims that the State's use of the terms "lo and behold" and "[p]oor Jason" were "sarcastic and gratuitous" and that the State misrepresented the evidence by arguing that the testimony describing a cream-colored Cadillac seen af-

ter A.S. and D.L. called for help had "no bearing on" the case because A.S. and D.L. waited in the house for some time before they left to seek help.

¶ 37 Regarding the prosecutor's statements suggesting that Defendant had a motive to lie and that Defendant's account was fabricated and absurd, we note that it is neither improper nor "uncommon for opposing counsel to claim in summation that a party's theories were fabricated." *State v. Germonto*, 868 P.2d 50, 63 (Utah 1993). And when there is "conflicting testimony adduced at trial, the prosecution's reference to [a] defendant as a liar, while intemperate," is not improper so long as doing so "only disclose[s] what the jury could have reasonably inferred from the evidence." *State v. Cummins*, 839 P.2d 848, 854 (Utah Ct.App.1992); *see also State v. Thompson*, 2014 UT App 14, ¶¶ 59–60, 318 P.3d 1221. Here, Defendant testified that he was not present at the Salt Lake shooting and that he was not in possession of the Beretta on the day of the Salt Lake shooting. His testimony contradicted that of three eyewitnesses, all of whom testified that Defendant was present at the crime scene and two of whom testified that Defendant fired the shots resulting in K.K.'s and the dog's deaths and A.S.'s and D.L.'s injuries. Defendant's testimony with respect to how he came into possession of the Beretta was inconsistent with the prior statement he had given to the police. Therefore, by suggesting that Defendant had a motive to lie and that Defendant's explanations were a "fabrication," an "absurdity," "convoluted," and "tortured," the prosecutor disclosed only "what the jury could have reasonably inferred from the evidence." *See Cummins*, 839 P.2d at 854. This is true despite the strong language used by the prosecutor. *See State v. Bryant*, 965 P.2d 539, 550 (Utah Ct.App.1998) (" '[A] prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation.' ") (quoting *United States v. Rivera*, 971 F.2d 876, 884 (2d Cir.1992)).

¶ 38 To the extent that the prosecutor's statements might be considered "sar-castic and gratuitous," we find nothing in the record to indicate that the few, isolated statements identified by Defendant were so "unrelenting and pervasive" that they would amount to an attempt "to inflame the jury with allegations that were irrelevant, matters that could not permissibly be presented as evidence, and exaggerated claims that no evidence could ever support." *See State v. Davis*, 2013 UT App 228, ¶¶ 27–30, 311 P.3d 538 (citations and internal quotation marks omitted). With respect to the prosecutor's remaining statements, we determine that they fall within the "considerable latitude" afforded to him in discussing from his viewpoint the "evidence and the inferences and deductions arising therefrom." *State v. Tillman*, 750 P.2d 546, 560 (Utah 1987).

¶ 39 Based on our review of the record and "the circumstances of the case as a whole," *see State v. Troy*, 688 P.2d 483, 486 (Utah 1984), we conclude that it was improper for the prosecutor to argue that defense counsel and Defendant introduced out-of-court witness statements either to confuse the jury or because they did not believe their own defense. However, we conclude that this error was harmless beyond a reasonable doubt. Also, because none of the prosecutor's remaining statements were misconduct, there was no error, and accordingly, Defendant's plain error claim fails. *See State v. Lynch*, 2011 UT App 1, ¶ 20, 246 P.3d 525. Likewise, defense counsel did not render ineffective assistance in failing to raise a futile objection to any of these comments. *See id.*

## IV. The Eyewitness Identifications

¶ 40 Shortly after the Salt Lake shooting, the police presented a six-photo lineup to A.S. and to D.L. during which both independently identified Defendant as the person who shot them and killed K.K. Defendant moved to suppress evidence of these identifications from being presented at trial. Following an evidentiary hearing, the trial court concluded that the identifications were "sufficiently reliable to be admitted at Defendant's trial." On appeal, Defendant argues that the identifications were inadmissible under the state due process clause.[9] *See* Utah

9. Defendant argues that we should conclude that

the trial court's admission of the eyewitness iden-

Const. art. I, § 7 ("No person shall be deprived of life, liberty or property, without due process of law....").

¶ 41 In considering the admissibility of an eyewitness identification, the trial court has the responsibility "to initially screen, under a totality of the circumstances standard, the eyewitness testimony so that it is sufficiently reliable as not to offend a defendant's right to due process." *State v. Guzman*, 2006 UT 12, ¶ 21, 133 P.3d 363. In analyzing reliability, our supreme court has identified the following "pertinent factors by which reliability must be determined" by the trial court:

(1) [T]he opportunity of the witness to view the actor during the event; (2) the witness's degree of attention to the actor at the time of the event; (3) the witness's capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly. This last area includes such factors as whether the event was an ordinary one in the mind of the observer during the time it was observed, and whether the race of the actor was the same as the observer's.

*State v. Ramirez*, 817 P.2d 774, 780–81 (Utah 1991) (alteration in original) (citation and internal quotation marks omitted).

¶ 42 Here, the trial court observed that a "plain reading of the relevant case law on eyewitness identification ... indicates that the assessment required under *Ramirez* applies primarily, if not exclusively, in circumstances where a stranger to the defendant is making the identification." Though Defendant was a stranger to D.L., he was not a stranger to A.S. The court therefore observed that "assessment of the reliability of

[A.S.'s] identification based upon the *Ramirez* factors is not, technically, required." Nevertheless, the court analyzed the reliability of each eyewitness's identification using those factors "for reasons of thoroughness." The trial court ultimately concluded that, based "upon a careful assessment of all the facts presented and the controlling case law," the eyewitness identifications were. reliable.

¶ 43 In challenging the trial court's decision, Defendant does not dispute the court's factual findings. Therefore, we review the court's ultimate reliability determination as a matter of law and "defer to the trial court's fact-finding role by viewing the facts in the light most favorable to the trial court's decision to admit." *Id.* at 782.

A. Opportunity to View Defendant

¶ 44 Both A.S. and D.L. were able to view Defendant for a significant period of time during their encounter with him. A.S. was able to view and interact with Defendant for approximately one hour, and D.L. viewed him for at least fifteen minutes. Defendant was not wearing a mask, nor did he attempt to disguise his identity in any other way. The living room of the house where the shootings occurred was small and well-lit. Accordingly, the trial court found, and we agree, that despite the fact that "the presence of multiple people in the house was undoubtedly distracting, the close quarters allowed both witnesses to clearly see the face of Defendant several times for more than simply a few minutes."

B. Degree of Attention

¶ 45 The trial court observed that neither A.S. nor D.L. "were casual or passing observers of the events occurring" on the day of the Salt Lake shooting. Despite obvious distractions, including loud noises and threats of physical violence from persons other than Defendant, A.S. testified that these

tifications also violates the federal Due Process Clause because in the area of eyewitness identification, the due process analysis under the Utah Constitution is "certainly as stringent as, if not more stringent than, the federal analysis." *State v. Ramirez*, 817 P.2d 774, 784 (Utah 1991); *see also* U.S. Const. amend. V ("[N]or shall any

person ... be deprived of life, liberty, or property, without due process of law."). However, because we determine that the identifications did not violate the Utah Constitution, we also conclude that they do not violate the federal Constitution.

distractions did not prevent her from repeatedly viewing Defendant's face. As the State points out, A.S.'s "prior association with Defendant and the length of time she spent with him minimized the negative effects of the distracting circumstances on her identification." D.L. testified that her focus during the event was on Defendant because he was the one making demands and issuing orders. At one point, Defendant and D.L. were looking at each other "face-to-face" so that Defendant could determine whether D.L. was telling him the truth. Thus, the trial court found that both A.S. and D.L. "consistently focused their attention on Defendant and what he was doing."

### C. Capacity to Observe

¶ 46 Defendant and the other intruders pointed their guns at A.S. and D.L., made threats of violence toward them, and struck A.S. several times with the butt of a gun and burned her with a cigarette—events that, according to the trial court, "caused the witnesses to experience significant levels of fear and stress." The anxiety experienced by A.S. caused her to bury her head in the couch and engage in a defense mechanism of blinking her eyes repeatedly in order to remain conscious. Nevertheless, the trial court found that the witnesses' ability to accurately view Defendant was not significantly undermined because "no evidence was presented that the level of fear and stress the witnesses experienced rendered them unconscious, or placed them in a stupor, which clearly would have prevented them from making accurate observations." The court also found that despite the witnesses' histories of drug abuse—including use of methamphetamine in the days just before the shootings—and A.S.'s mental health issues, the evidence indicated "without contradiction" that these factors had no negative effect on the witnesses' ability to perceive and observe Defendant.

### D. Spontaneity, Consistency, and Suggestibility of the Identification

¶ 47 A.S. initially told the police that she did not know who shot her. However, during an interview the next day, she stated that she would not provide information to law enforcement because she feared for her safety and her son's safety based upon threats that the intruders made and because the intruders had not yet been arrested. After arresting Defendant, the police presented A.S. with a photo lineup. The detective read her the lineup instructions and confirmed her understanding of them. He then showed A.S. the photos, at which point she began to cry and identified Defendant, saying, "That's Jason." She indicated a level of confidence in her identification as one-hundred percent. The same detective separately presented D.L. with the same photo lineup. Again, the detective verified that D.L. read the lineup instructions and that she understood those instructions. Upon seeing the photographs, D.L. identified Defendant and told the detective that her level of certainty was sixty percent. Both victims told the police that Defendant was wearing a goatee at the time of the shooting and that their being on pain medication at the time they made the identifications did not affect their ability to consider the photographs. Both victims also indicated that they had not viewed any media coverage that identified Defendant. In addition, the "identifications occurred nine to eleven days after the shooting," which, according to the trial court, was "still sufficiently close in time to the incident that the witnesses' observations would still be fresh in their minds" and yet "not so close in time that the stress and fear of the events would not have abated to a significant degree." *Cf. State v. Hollen*, 2002 UT 35, ¶ 47, 44 P.3d 794 (noting that witnesses to a bank robbery "had at least two months to recover from the stress of the robbery before their identifications").

¶ 48 As for suggestibility, the photo lineup used by the detective included six photographs of persons with similar profiles and similar ages, some with goatees and others without. All six photographs were the same size and quality, and all of the persons in the photographs had similar ethnic features. Defendant's photograph was neither the first nor the last in the lineup. Neither witness was told that Defendant's photograph was in the lineup, nor were they told that any identification was required. We are not con-

vinced that the identifications were the product of a suggestive lineup.

## E. The Nature of the Event

¶ 49 The trial court found that the "evidence presented indicates that [A.S. and D.L.] were readily aware that the incident involving them on [the day of the Salt Lake shooting] was neither ordinary nor routine." The court stated that based upon the "extraordinary circumstances that were developing, with intruders brandishing firearms, making threats, and engaging in violence, there can be little question that 'the nature of the event tended to focus the attention of the witnesses on what was occurring.'" (Quoting *Hollen*, 2002 UT 35, ¶ 61, 44 P.3d 794.)

¶ 50 Under the totality of the circumstances described above, we conclude that the trial court correctly determined that the identifications of A.S. and D.L. were sufficiently reliable for admission at trial.[10]

## V. Jury Instructions

¶ 51 Defendant challenges the jury instructions on three grounds. He argues that the instructions failed to properly instruct the jury on (1) accomplice liability, (2) the mens rea for aggravated robbery, and (3) the mens rea for aggravated cruelty to animals. With respect to the aggravated robbery and aggravated cruelty to animals instructions, Defendant concedes that he failed to preserve his objections for our review on appeal. Nevertheless, he argues that these flawed instructions merit the reversal of his convictions on the basis of plain error and ineffective assistance of counsel.

## A. Accomplice Liability

¶ 52 Relying on *State v. Jeffs*, 2010 UT 49, 243 P.3d 1250, Defendant argues that Instruction 23 regarding accomplice liability was flawed because it "'allowed for the possibility that [Defendant] would be found guilty'" if the jury found that he was present at the Salt Lake shooting without regard to

whether he had the "'intent that the underlying offense be committed and the intent to aid the principal actor in the offense.'" (Quoting *id.* ¶¶ 51, 52.) Instruction 23 provides,

> Every person, acting with the mental state required for the commission of the offense who directly commits the offense, who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct.

This instruction was copied nearly verbatim from Utah's accomplice liability statute. *See* Utah Code Ann. § 76–2–202 (LexisNexis 2003). The State contends that, "unlike in *Jeffs*, the instructions as a whole adequately instructed the jury on the intent required to convict Defendant as an accomplice." We agree with the State.

¶ 53 In *Jeffs*, where the jury convicted the defendant of two counts of rape as an accomplice, the accomplice liability instruction did not repeat the language of the accomplice liability statute. 2010 UT 49, ¶¶ 1, 41, 243 P.3d 1250. No other instruction in that case indicated to the jury that conviction as an accomplice to rape would require the defendant to have acted with the mental state required for rape. *Id.* ¶ 42. Indeed, our supreme court held that the accomplice liability instruction "only indicated that the reckless, knowing, or intentional mental state attached to the actions of 'solicited, requested, commanded, or encouraged,' not to the underlying criminal conduct of rape." *Id.*

¶ 54 By contrast, in *State v. Augustine*, 2013 UT App 61, 298 P.3d 693, a jury convicted the defendant of attempted murder. *Id.* ¶ 1. On appeal, the defendant argued that the accomplice liability jury instruction, which quoted Utah's accomplice liability statute verbatim, failed "to adequately instruct the jury that the mental state required in order to find him guilty of attempted murder as an accomplice was the actual intent to cause

---

10. Citing rule 403 of the Utah Rules of Evidence, Defendant also argues that the trial court "should have suppressed [A.S.'s] and [D.L.'s] identifications because the probative value, if any, was substantially outweighed by the danger that the jury would believe the eyewitness identifications no matter how unreliable they were." Because we conclude that the identifications were reliable, we reject Defendant's argument on this point.

death." *Id.* ¶ 8 (internal quotation marks omitted). However, we observed that an additional jury instruction also provided the elements for the underlying crime of attempted murder, including the required mens rea. *Id.* ¶ 10. Thus, while noting that the accomplice liability instruction only indicated "that a requirement of accomplice liability is that the accomplice act[ ] with the mental state required for the . . . offense," we concluded that because the attempted murder instruction clearly indicated that a conviction for attempted murder required a finding that the defendant had the requisite intent for that crime, reading the instructions together adequately explained the mens rea requirement for accomplice liability. *Id.* (alteration and omission in original) (internal quotation marks omitted); *see also State v. Lucero,* 866 P.2d 1, 3 (Utah Ct.App.1993) ("Jury instructions must be read and evaluated as a whole. They must accurately and adequately inform a criminal jury as to the basic elements of the crime charged." (citation omitted)). We therefore held that the jury instructions as a whole accurately and adequately informed the jury of the mental state necessary to convict the defendant as an accomplice to attempted murder, even assuming the jury focused on the accomplice liability instruction in the face of compelling evidence of the defendant's liability as a principal. *Augustine,* 2013 UT App 61, ¶ 10, 298 P.3d 693.

¶ 55 In this case, Instruction 23 is substantively identical to the accomplice liability statute and to the instruction given in *Augustine.* It instructs the jury that to convict as an accomplice, Defendant must have acted with the mental states required for the commission of the underlying offenses, which include one count of aggravated murder, two counts of attempted aggravated murder, three counts of aggravated kidnapping, one count of aggravated burglary, one count of aggravated robbery, and one count of aggravated cruelty to animals. For each of these counts, the trial court provided a jury instruction detailing the elements of each crime, including the required mental state. Therefore, we determine, as we did in *Augustine,* that the jury instructions "accurately and adequately" informed the jury as to

accomplice liability when "read and evaluated as a whole," even assuming the jury focused on the accomplice liability instruction in the face of compelling evidence of Defendant's liability as a principal. *See Lucero,* 866 P.2d at 3.

### B. Mens Rea for Aggravated Robbery and Aggravated Cruelty to Animals

¶ 56 None of the several instructions given to the jury addressing aggravated robbery informed the jury that a necessary element of that crime is that the perpetrator take the property "with a purpose or intent to deprive the person permanently or temporarily of the personal property." *See* Utah Code Ann. § 76–6–301(1)(a) (LexisNexis Supp.2006). The State, though conceding that "Defendant correctly observe[d] that the instructions omitted this element," argues that because this element was uncontested by Defendant at trial and because "defense counsel strategically chose to concede Defendant's guilt on all of the non-murder charges if the jury found that he was the shooter," the omission in the jury instruction did not prejudice Defendant for purposes of plain error or ineffective assistance of counsel. We agree with the State.

¶ 57 After having argued to the jury that Defendant was not guilty because he was not present at the Salt Lake shooting, defense counsel concluded his closing argument by stating,

> You know, if you disagree and you believe beyond a reasonable doubt that [Defendant] was there and that he was the shooter, [the prosecutor] went through all those elements, you don't need to waste your time, if you believe he was there beyond a reasonable doubt, and you believe that he's the shooter who shot [K.K.], [A.S.,] and [D.L.], then I'll concede right now. [Defendant] will concede that the other crimes are there also. You can't have some of them and not all of them. But the [State] hasn't done that and we would ask you to find [Defendant] not guilty.

At no point did defense counsel argue that though Defendant was present at the crime scene, the victims' cell phones were taken

with the intent to keep them only temporarily. Also, both A.S. and D.L. testified that they never saw their cell phones again once they were taken. Generally, the trial court's failure to instruct the jury on the basic elements of an offense cannot be considered harmless error. *State v. Jones*, 823 P.2d 1059, 1061 (Utah 1991). But where, as here, the facts indisputably establish an element and that element is not an issue at trial, a trial court's failure to instruct on the element cannot be prejudicial. *See, e.g., State v. Fontana*, 680 P.2d 1042, 1048–49 (Utah 1984) (holding that in "view of the nature and quantity of evidence" in a second-degree murder case, there was "no reasonable likelihood that a depraved indifference instruction that included an express treatment of [an omitted] knowledge element would have produced a more favorable result for the defendant"); *State v. Netzler*, 2005 UT App 524U, para. 4, 2005 WL 3315333 ("The element challenged on appeal was undisputed at trial; therefore, the incompleteness of the jury instructions constitutes harmless error at most."); *State v. Stevenson*, 884 P.2d 1287, 1292 (Utah Ct.App.1994) (holding that failure to instruct on an element of rape was harmless because the element was undisputed at trial).

¶ 58 Because Defendant never contested the missing element, and actually conceded guilt on all remaining charges if the jury found that he was guilty of murder, he has not shown that the omission in the aggravated robbery instruction prejudiced him. We therefore conclude that despite this error in the jury instructions, Defendant has not demonstrated either plain error or ineffective assistance of counsel.[11] *See State v. Munguia*, 2011 UT 5, ¶ 13, 253 P.3d 1082 ("The prejudice analysis is the same under both a plain error and ineffective assistance of counsel framework." (citation and internal quotation marks omitted)).

 ¶ 59 With respect to his aggravated cruelty to animals conviction, the relevant jury instruction stated that the jury could only convict Defendant if the jury found beyond a reasonable doubt that he had recklessly killed A.S.'s dog, or killed A.S.'s dog without being privileged to do so. However, the jury instructions do not define the term "recklessly." Defendant argues that this omission resulted in an inaccurate instruction because it "failed to provide the legal definition of the mens rea element." Assuming without deciding that this omission constituted an error, we nevertheless conclude that no prejudice resulted for the same reasons that no prejudice resulted from the error in the aggravated robbery instruction—Defendant conceded his guilt on this charge if the jury found he was the person who shot and killed K.K.

### VI. Cumulative Error

¶ 60 We will reverse Defendant's convictions under the doctrine of cumulative error only if the cumulative effect of all identified and assumed errors undermines our confidence in the essential fairness of Defendant's trial. *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993). Here, we have identified two errors—the prosecutor's comment to the jury that defense counsel and Defendant introduced out-of-court witness statements either to confuse the jury or because they did not believe their own defense and the omission of the "intent to deprive" element from the aggravated robbery instruction. Additionally, we have assumed that error may have occurred in several additional · instances. However, even considering "the cumulative effect of the identified and assumed errors," our "confidence in the essential fairness" of Defendant's trial is not undermined. *See id.*

### CONCLUSION

¶ 61 For the reasons stated above, we affirm Defendant's convictions on all counts.

---

11. Defendant claims ineffective assistance of counsel solely on the basis that defense counsel failed to object to the flawed jury instructions. Defendant does not argue that defense counsel rendered ineffective assistance by conceding guilt on all remaining charges if the jury found that Defendant was guilty of murder.